877 F.2d 189
 14 Fed.R.Serv.3d 353
 FIRST FIDELITY BANK, N.A., a national banking association,
formerly doing business as First National Bank of
New Jersey, Appellee,
v.
The GOVERNMENT OF ANTIGUA & BARBUDA--PERMANENT MISSION, Appellant.
 No. 777, Docket 88-7863.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 23, 1989.
Decided June 7, 1989.
 
 Pamela A. Bresnahan, Laxalt, Wash., Perito & Dubuc (Stacey E. Athans, New York City, Robert B. Washington, Jr., Anthony M. Alexis, Washington, D.C., of counsel), for appellant.
 William M. O'Connor, Foyen & Peri (Joseph D. Giacoia, New York City, of counsel), for appellee.
 Before OAKES, Chief Judge, NEWMAN, Circuit Judge, and HAIGHT, District Judge.*
 OAKES, Chief Judge:
 
 
 1
 The Government of Antigua and Barbuda appeals from a decision of the United States District Court for the Southern District of New York, Louis L. Stanton, Judge, which denied its motion for relief under Rule 60(b) of the Federal Rules of Civil Procedure. First Fidelity Bank had secured a default judgment against Antigua in a suit on a note signed by Antigua's ambassador to the United Nations and had then entered into a consent order also executed by the ambassador purportedly on his country's behalf. Antigua requested the court to set aside the default judgment and dismiss the complaint or, in the alternative, to vacate the consent order. The issue is the extent to which Antigua is bound by the actions of its ambassador to the United Nations. We conclude that the default judgment should have been set aside and therefore reverse the decision and remand the case to the district court for further proceedings.
 
 BACKGROUND
 
 2
 In November 1983, First Fidelity's predecessor, First National State Bank of New Jersey, loaned $250,000 to Lloydstone Jacobs, Antigua's ambassador to the United Nations. Jacobs signed for the loan as ambassador, representing the "Government of Antigua & Barbuda--Permanent Mission." The stated purpose of the loan was to pay for the renovation of Antigua's Permanent Mission to the United Nations in New York. Repayment of the loan ceased in mid-1985. In September 1985, the bank contacted government officials in Antigua, seeking repayment. The following month, the bank wrote to Jacobs and to Prime Minister Vere C. Bird's permanent secretary, threatening legal action. According to an officer of the bank, the permanent secretary told the officer by telephone in November that Jacobs and Robert Healy, in-house counsel for Antigua's Permanent Mission, were authorized to negotiate a settlement, but this is now disputed by Antigua.
 
 
 3
 No settlement was reached, and in July 1986 First Fidelity sued Antigua for repayment. Antigua did not answer the complaint, although it concedes that it was properly served. Representatives of the bank met with Jacobs and Healy. According to the bank, Jacobs and Healy acknowledged that Antigua had no defense against the action and revealed that the proceeds from the loan had in fact been invested in a casino. There was still no settlement, however, so the bank sought a default judgment. The bank decided, "[a]fter a review of Mr. Healy's involvement and appearance in this action," to obtain the default judgment by formal motion. The district court granted the default judgment on December 19, 1986.
 
 
 4
 First Fidelity's efforts to levy upon Antigua's bank accounts in New York provoked a response from Jacobs. He wrote to the district court in September 1987, acknowledging the debt and seeking a settlement. The following month, the bank and Jacobs agreed to a settlement and signed a consent order. The consent order included a complete waiver of Antigua's sovereign immunity from jurisdiction, attachment, and execution; it was signed on behalf of the Government of Antigua and Barbuda by Lloydstone Jacobs, "Ambassador Extraordinary and Plenipotentiary," and by Robert Healy as the Government's attorney.
 
 
 5
 First Fidelity received $70,000 pursuant to the consent order, but in January 1988 payments ceased again. The bank executed upon a New York account of Antigua's Permanent Mission but obtained only $500. First Fidelity then sought to attach bank accounts maintained by Antigua's embassy in Washington, D.C. The Government of Antigua, sitting in the capital city of St. John's, then took its first direct action in this case: it moved in the district court to dismiss First Fidelity's complaint for lack of subject matter jurisdiction or, alternatively, to vacate the consent order. Antigua claimed that it was not bound by Jacobs' actions because he had acted without authority in borrowing the money and in consenting to the settlement. Since Antigua was not responsible for Jacobs' fraudulent activities, the argument ran, it retained its sovereign immunity. Judge Stanton denied the motion; in a brief memorandum, he applied agency law to hold Antigua responsible for Jacobs' actions. Antigua could not interpose sovereign immunity, he decided, because the loan fell within the Foreign Sovereign Immunity Act's commercial activity exception. Antigua then filed this appeal.[1]
 
 DISCUSSION
 
 6
 First Fidelity asserts that Jacobs possessed the actual authority to bind Antigua. The bank goes on to claim that, even if Jacobs lacked that actual authority, under applicable agency law he nevertheless had ample apparent authority to bind Antigua. In this context, First Fidelity emphasizes the power inherent in an ambassador's position: the bank claims that, as "Ambassador Extraordinary and Plenipotentiary," Jacobs occupied the highest rank in diplomacy, as established by the Congresses of Vienna (1815) and Aix-la-Chapelle (1818). Under the Headquarters Agreement with the United Nations, an ambassador to the U.N. possesses the same privileges and immunities as diplomatic envoys accredited to the United States. See Agreement Between the United Nations and the United States of America Regarding the Headquarters of the United Nations, June 26, 1947, art. V, Sec. 15, 61 Stat. 3416, 3427-28, T.I.A.S. No. 1676, at 13-15, authorized by S.J. Res. of Aug. 4, 1947, Pub.L. No. 80-357, 61 Stat. 756, set out in 22 U.S.C. Sec. 287 note (1982).
 
 
 7
 The powers of an ambassador may include the authority to conclude international agreements. See Restatement (Third) of Foreign Relations Sec. 311 (1987). "Heads of diplomatic missions and representatives accredited to international organizations are regarded as possessing powers to negotiate agreements on matters within their jurisdiction." Id. comment b. An ambassador thus may have the power to bind the state that he represents. Normally, of course, a state authorizes a representative to act on its behalf. However, a state can be bound by the representative's unauthorized actions where the lack of authority is not obvious. Id. Sec. 311(3) & Reporters' Note 4. Legal Status of Eastern Greenland (Den. v. Nor.), 1933 P.C.I.J. (ser. A/B) No. 53 (Apr. 5), is an example of this. There, the Permanent Court of International Justice held that Norway was bound by an oral declaration of its foreign minister that his country would not contest Danish sovereignty over Eastern Greenland. Id. at 71. First Fidelity argues that this application of the principles of agency law of developed states in international law supports its claim against Antigua here.
 
 
 8
 The implication of First Fidelity's argument is that Antigua is bound by Jacobs' actions solely because he was Antigua's ambassador to the U.N. In effect, First Fidelity is telling us: "L'etat, c'est lui." If it were true, as a matter of law, that an ambassador's actions under color of authority automatically bind the state that he represents, then we must affirm the decision below: Antigua would be bound by Jacobs' settlement of this lawsuit. We do not believe, however, that a person's position as ambassador, and nothing more, should be dispositive in this case, let alone all cases.
 
 
 9
 The authority to conclude international agreements, described in Restatement (Third) of Foreign Relations Sec. 311, does not support an automatic rule binding the state in any transaction with non-sovereign third parties. The issue here is not whether Jacobs, as ambassador, possessed the authority to borrow money or to waive Antigua's sovereign immunity in a settlement of the lawsuit. Assuming that he had that authority does not lead inevitably to the conclusion that his actions here must be attributed to Antigua. Put another way, the possession of authority does not, ipso facto, validate every exercise of it. In the Eastern Greenland case, it was not simply the Norwegian minister's position or title that made his declaration binding upon Norway. The Court carefully examined the context in which the declaration was made. See 1933 P.C.I.J. (ser. A/B) No. 53, at 71-73. International agreements have considerably more dignity than Jacobs' purely commercial transactions with First Fidelity. See Restatement (Third) of Foreign Relations Sec. 301(1) (defining international agreement). Even so, an ambassador's signature does not make an international agreement automatically binding upon the state. Coercion of a state's representative, for example, renders an agreement signed by that representative void, id. Sec. 331(2)(a), and corruption of the representative permits the state to invalidate its consent to the agreement, id. Sec. 331(1)(c). If the circumstances surrounding an ambassador's signature of a treaty may be grounds for invalidating that treaty, then surely a state cannot automatically be bound by its ambassador's settlement of a lawsuit by a non-sovereign third party arising from a commercial transaction.
 
 
 10
 The conduct of an ambassador may be attributed to his state under other circumstances. In the words of the Restatement (Third) of Foreign Relations, "[a] state is responsible for any violation of its obligations under international law resulting from action or inaction by ... any ... official, employee, or other agent of a government or of any political subdivision, acting within the scope of authority or under color of such authority." Id. Sec. 207(c). This rule would apply even if the act were unauthorized by the responsible national authorities and even if it were forbidden by law. Id. comment d. However, by its own terms, section 207 applies only to violations of international law. A breach of a commercial contract, such as that alleged by First Fidelity in this case, is not a violation of international law unless the breach is discriminatory, or it occurs for governmental rather than commercial reasons and the state is not prepared to pay damages for the breach. Restatement (Third) of Foreign Relations Sec. 712(2) comment h & Reporters' Note 8. Moreover, an assessment under section 207 of the scope and color of authority introduces elements of agency law: one must "consider all the circumstances." These include matters that are relevant in this case: "whether the affected parties reasonably considered the action to be official, [and] whether the action was for public purpose or for private gain." Id. comment d. Thus, we cannot derive from section 207 a broader rule making every action by an ambassador binding upon his government.
 
 
 11
 We conclude that an ambassador's actions under color of authority do not, as a matter of law, automatically bind the state that he represents. The facts of a given case must be examined, and the agency law of developed states, here our own, provides the proper framework for that examination. Cf. Restatement (Third) of Foreign Relations Sec. 311 Reporters' Note 4 (noting that provision concerning apparent authority to conclude international agreements is analogous to national laws on the authority of agents).[2]
 
 
 12
 The question here would be whether Jacobs, as Antigua's ambassador to the United Nations, in the circumstances of this case possessed the apparent authority to borrow the money and to waive Antigua's sovereign immunity. See Restatement (Second) of Agency Sec. 8 (1958) (defining apparent authority). Under the Restatement (Second) of Agency, a principal causes his agent to have apparent authority by conduct which, reasonably interpreted, causes third persons to believe that the principal consents to have an act done on his behalf. Id. Sec. 27. The appointment of a person to a position with generally recognized duties may create apparent authority. Id. comment a; Sec. 49 comment c. A decision whether apparent authority exists thus requires a factual inquiry into the principal's manifestations to third persons. General Overseas Films, Ltd. v. Robin Int'l, Inc., 542 F.Supp. 684, 689 (S.D.N.Y.1982), aff'd, 718 F.2d 1085 (2d Cir.1983). In addition, under New York law,[3] the circumstances of the transaction must be examined to determine whether the person relying on the apparent authority fulfilled his "duty of inquiry." Id.; cf. Restatement (Third) of Foreign Relations Sec. 456 comment b (party relying on waiver of sovereign immunity had burden of showing that person waiving had authority to bind the state).
 
 
 13
 Thus, agency law is flexible enough so that the fact that a person is an ambassador can be given its appropriate weight in determining the extent of his apparent authority. The fact that Jacobs was Antigua's ambassador to the U.N. does not make his settlement of the lawsuit binding upon Antigua, but that fact is relevant in deciding whether First Fidelity's reliance upon his authority was reasonable.
 
 
 14
 Antigua claims that Jacobs exceeded his authority (both actual and apparent) in borrowing the money and, later, in waiving Antigua's sovereign immunity. Jacobs may have acted, the argument runs, but Antigua did nothing. Antigua claims that it therefore retains its sovereign immunity despite the fact that the loan itself was commercial activity within the meaning of the Foreign Sovereign Immunity Act (FSIA). See 28 U.S.C. Secs. 1603(d), 1605(a)(2) (1982) (defining commercial activity exception). The default judgment, Antigua concludes, was void for want of subject matter jurisdiction. This would entitle Antigua to relief from the default judgment under Rule 60(b)(4).
 
 
 15
 First Fidelity responds that Antigua cannot present its substantive defense when seeking relief under Rule 60(b)(4). The bank cites Meadows v. Dominican Republic, 628 F.Supp. 599 (N.D.Cal.1986), aff'd, 817 F.2d 517 (9th Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 486, 98 L.Ed.2d 485 (1987), in support of this argument. In Meadows, the Dominican Republic sought relief from a default judgment under Rule 60(b)(4), arguing that its codefendant, the Instituto de Auxilios Y Viviendas, was a separate juridical entity under Dominican law and that the Instituto's acts were not attributable to the Republic. Hence, the Republic was not properly joined as a defendant, and its contacts with the forum were not a basis for personal jurisdiction over the Instituto. The district court rejected this argument. The issue under Rule 60(b)(4), the district court said, is whether the default judgment is void. Under First National City Bank v. Banco Para el Comercio Exterior de Cuba, 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983), juridical separateness is a question of substantive law, not of subject matter jurisdiction. An error of substantive law, unlike an erroneous determination that jurisdiction exists, is not a ground for vacating a default judgment as void. The court therefore concluded that the issue of juridical separateness was "not open for consideration" in determining whether the default judgment was void. 628 F.Supp. at 608. See also Gregorian v. Izvestia, 658 F.Supp. 1224, 1236 (C.D.Cal.1987) ("An error in interpreting material facts is not equivalent to acting with total lack of jurisdiction.").
 
 
 16
 Meadows and Gregorian are relevant to our case, but they are not dispositive. Closer analysis of sovereign immunity and subject matter jurisdiction under the FSIA shows that the distinction between substance and procedure is not so clear-cut. Congress viewed sovereign immunity as an "affirmative defense." See H.R.Rep. No. 1487, 94th Cong., 2d Sess. 17, reprinted in 1976 U.S.Code Cong. & Admin.News 6604, 6616. However, the Supreme Court has recognized that a district court's subject matter jurisdiction depends upon the existence of an exception to foreign sovereign immunity. Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 493 & n. 20, 103 S.Ct. 1962, 1971 & n. 20, 76 L.Ed.2d 81 (1983). It is not surprising, then, that a decision concerning subject matter jurisdiction under the FSIA may require the resolution of substantive issues.
 
 
 17
 For example, in Carl Marks & Co. v. USSR, 665 F.Supp. 323 (S.D.N.Y.1987), aff'd per curiam, 841 F.2d 26 (2d Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 2874, 101 L.Ed.2d 909 (1988), the Soviet Union moved under Rule 60(b) to vacate two default judgments. Judge Brieant distinguished between 60(b)(1) and (b)(6) motions, which require a court to examine the merits of a case, and 60(b)(4) motions, which are jurisdictional. Id. at 332-33. He noted, however, that a 60(b)(4) dismissal in an FSIA case can look like a decision on the merits. The FSIA begins with a presumption of immunity which the plaintiff must overcome by showing that the defendant sovereign's activity falls under one of the statutory exceptions. "Thus, ... '[i]n many cases a resolution of the substantive immunity law issues will be required in order to reach a decision on subject matter jurisdiction.... [A] court may have to interpret the substantive principles embodied in Secs. 1605-1607 before deciding whether to take jurisdiction.' " Id. at 333 (quoting Corporacion Venezolana de Fomento v. Vintero Sales Corp., 629 F.2d 786, 790-91 n. 4 (2d Cir.1980), cert. denied, 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981)); see also Upton v. Empire of Iran, 459 F.Supp. 264, 265 (D.D.C.1978) (FSIA "creates an identity of substance and procedure"), aff'd, 607 F.2d 494 (D.C.Cir.1979).
 
 
 18
 In Carl Marks, Judge Brieant had to consider the merits of the case in order to determine whether his court had jurisdiction over the case: he found that the defendant's actions that were the basis for the suit occurred before the effective date of the FSIA. The default judgments were therefore void for want of jurisdiction under Rule 60(b)(4), and the complaints were dismissed. 665 F.Supp. at 349. Thus, Carl Marks seems to open the way for a consideration of the substantive issues here--i.e., the extent of Jacobs' authority and the validity of the waiver in the consent order--and indeed, Judge Stanton did examine the merits in denying Antigua's 60(b) motion.
 
 
 19
 The facts in our record are susceptible of two opposing interpretations. First Fidelity has alleged facts sufficient to show Jacobs' and Healy's apparent authority under New York law. See Hallock v. State, 64 N.Y.2d 224, 231, 474 N.E.2d 1178, 1181, 485 N.Y.S.2d 510, 513 (1984) (apparent authority exists where principal's conduct leads third party reasonably to believe that agent has authority). If Jacobs and Healy acted within their apparent authority in their transactions with the bank, then Antigua would be liable. See Restatement (Second) of Agency Sec. 159 (liability created by actions within apparent authority). However, there is also evidence that First Fidelity mistrusted Jacobs' and Healy's bona fides, which raises questions about the reasonableness of First Fidelity's reliance upon their apparent authority. See Ford v. Unity Hosp., 32 N.Y.2d 464, 472, 299 N.E.2d 659, 664, 346 N.Y.S.2d 238, 244 (1973) ("One who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority."); General Overseas Films, Ltd. v. Robin Int'l, Inc., 542 F.Supp. 684, 690 (S.D.N.Y.1982) (extraordinary nature of transaction should have altered plaintiff to danger of fraud), aff'd, 718 F.2d 1085 (2d Cir.1983); Restatement (Third) of Foreign Relations Sec. 456 comment b (party relying on waiver has burden of showing that person waiving had authority to bind state); Restatement (Second) of Agency Sec. 165 (principal is not liable for agent's improper actions if third party knows that agent is not acting for principal's benefit).
 
 
 20
 Thus, it may be that Antigua is the innocent victim of its ambassador's fraud and the bank's willful ignorance of the ambassador's lack of authority. If so, Antigua would retain its sovereign immunity, and the default judgment against it would be void for want of subject matter jurisdiction. On the other hand, Antigua may simply be trying to renege on a loan by disowning its agent who borrowed the money. In that case, the FSIA's commercial activity exception would strip Antigua of its sovereign immunity, and the district court would have subject matter jurisdiction. The default judgment would be valid, and the consent order would be enforceable. As in Carl Marks, it is impossible to make a decision concerning subject matter jurisdiction without considering the merits.
 
 
 21
 A decision that a default judgment is void for want of jurisdiction must be accompanied by dismissal of the action. See Thos. P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica, 614 F.2d 1247, 1256 (9th Cir.1980) (per curiam); Gregorian, 658 F.Supp. at 1229. In this case, however, since subject matter jurisdiction is interwoven with the merits, dismissal of the suit before trial would leave both the substantive and the jurisdictional issues unexplored. We find that there are enough doubts about the facts in this case (where disputed affidavits from First Fidelity comprise vital parts of the record) to justify setting aside the default judgment. Yet these same doubts about the facts weigh against declaring the default judgment void and dismissing the complaint under Rule 60(b)(4); we cannot assess the validity of the default judgment because we know too little about the interwoven jurisdictional and substantive issues. We turn, then, to Rule 60(b)(6), under which a judgment may be set aside for "any other reason justifying relief."
 
 
 22
 Relief under Rule 60(b)(6) is appropriate only in cases presenting "extraordinary" circumstances. See Ackermann v. United States, 340 U.S. 193, 202, 71 S.Ct. 209, 213, 95 L.Ed. 207 (1950). Litigants may not use this clause simply to circumvent the time limits of other provisions of Rule 60(b). Serzysko v. Chase Manhattan Bank, 461 F.2d 699, 702 (2d Cir.), cert. denied, 409 U.S. 883, 93 S.Ct. 173, 34 L.Ed.2d 139 (1972). However, default judgments are disfavored, especially those against foreign sovereigns. Restatement (Third) of Foreign Relations Sec. 459 comment c & Reporters' Note 1. Courts go to great lengths to avoid default judgments against foreign sovereigns or to permit those judgments to be set aside. See, e.g., Jackson v. People's Republic of China, 794 F.2d 1490, 1494-96 (11th Cir.1986), cert. denied, 480 U.S. 917, 107 S.Ct. 1371, 94 L.Ed.2d 687 (1987); Carl Marks, 665 F.Supp. at 329-30. In this case, the fusion of substantive and jurisdictional issues also militates in favor of setting aside the default judgment under Rule 60(b)(6); the parties must proceed to discovery and possibly to trial before a court can rule on either substance or jurisdiction. We conclude that it was an abuse of discretion not to set aside the default judgment under Rule 60(b)(6). See Bankers Mortgage Co. v. United States, 423 F.2d 73, 77 (5th Cir.) (Rule 60(b) should be interpreted "to preserve the delicate balance between the sanctity of final judgments ... and the incessant command of the court's conscience that justice be done in light of all the facts"), cert. denied, 399 U.S. 927, 90 S.Ct. 2242, 26 L.Ed.2d 793 (1970); Radack v. Norwegian American Line Agency, Inc., 318 F.2d 538, 542 (2d Cir.1963) (Rule 60(b)(6) "should be liberally construed when substantial justice will thus be served").
 
 
 23
 Antigua should, then, have an opportunity to defend this case on its merits. Cf. Practical Concepts, Inc. v. Bolivia, 811 F.2d 1543, 1551-52 (D.C.Cir.1987) (vacating district court's decision to set aside default judgment and dismiss case; nonetheless declining to reinstate default judgment for policy reasons, instead remanding for consideration of defendant's substantive defenses). At the same time, First Fidelity's rights must be protected, for there is some evidence that Antigua responded to this lawsuit only when First Fidelity began to grasp its assets. Rule 60(b) provides for relief "upon such terms as are just." See, e.g., Bennett v. Circus U.S.A., 108 F.R.D. 142, 149 (N.D.Ind.1985). The default judgment is vacated and the case is remanded to the district court for further proceedings on the condition that Antigua post a bond covering the amount claimed by First Fidelity, including interest.
 
 
 24
 Judgment in accordance with opinion; costs to neither party.
 
 JON O. NEWMAN, Circuit Judge, dissenting:
 
 25
 This case has serious implications for the relationships between the United States and all foreign states that send duly accredited ambassadors to head their diplomatic missions in this country. Because I believe the majority has fashioned a rule of law that risks impairment of those relationships, I respectfully dissent.
 
 
 26
 Though the case comes to us after entry of a default judgment, certain key facts are undisputed. In 1983, Lloydstone Jacobs was an Ambassador Extraordinary and Plenipotentiary of the Government of Antigua and Barbuda and the Permanent Representative of that government to the United Nations. He headed the Antiguan Mission to the UN in New York City. Ambassador Jacobs signed a note for the repayment of money borrowed from what is now known as the First Fidelity Bank. The note states that the borrower is the "Government of Antigua & Barbuda--Permanent Mission." Ambassador Jacobs represented that the loan proceeds were to be used for renovations at his government's UN Mission and its New York City tourist office. He subsequently used the funds for construction of a casino resort in Antigua, in which he and other officials of the Antiguan government held ownership interests. Antigua contends that under the Antiguan Constitution and statutes, the authority to borrow funds requires the prior approval of the cabinet and a delegation of authority to the Minister of Finance, and that neither had occurred in this case. For purposes of this appeal, I accept that contention.
 
 
 27
 Litigation brought by the Bank to collect the loan resulted initially in a default judgment against the Government of Antigua and Barbuda and subsequently in a stipulation of settlement, which was "so ordered" by the District Court. The stipulation contained an express waiver of the immunity of Antigua from the jurisdiction of the courts of the United States under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. Secs. 1604, 1605(a)(1) (1982). The stipulation was signed on behalf of Antigua by Jacobs in his capacity as Ambassador Extraordinary and Plenipotentiary and by an attorney representing Antigua.
 
 
 28
 The majority directs that the default judgment be vacated and that the District Court conduct an inquiry into whether the Bank was entitled to rely on the apparent authority of Ambassador Jacobs to borrow the money and to settle the ensuing litigation. In that inquiry, Antigua will be entitled to a dismissal of the Bank's claim on the basis of sovereign immunity if it can establish "that Antigua is the innocent victim of its ambassador's fraud and the bank's willful ignorance of the ambassador's lack of authority." 877 F.2d at 195. The majority decides the case by rejecting the proposition that Antigua is bound by the actions of its Ambassador solely by virtue of his office and by concluding that the only inquiry left once that proposition is rejected is whether Antigua is bound under the doctrine of apparent authority.
 
 
 29
 The initial question concerns choice of law. Though foreign states, if amenable to suit in this country, may, in most circumstances, be obliged to accept state substantive law that normally applies to such matters as contracts and creditors' rights, they are entitled to expect that this country will have a uniform body of federal law that determines those issues of agency law that implicate relationships between a foreign government and its ambassador accredited within this country. In this respect, it should make no difference that Jacobs was his country's Ambassador to the UN, rather than to the Government of the United States. As the host country to the United Nations headquarters, this country has an obligation to develop federal law on the sensitive subject of a UN ambassador's authority to bind his government on ordinary commercial matters. In the absence of federal legislation on the subject, the matter is appropriate for the development of federal common law. Cf. First National City Bank v. Banco Para el Comercio Exterior de Cuba, 462 U.S. 611, 623, 103 S.Ct. 2591, 2598, 77 L.Ed.2d 46 (1983) (federal common law is appropriate for deciding whether separate juridical status of foreign state's instrumentality should shield it from liability).
 
 
 30
 Turning, then, to the issue of agency law, as a matter of federal common law in this context, I can agree with the majority that a person's role as his country's UN ambassador does not automatically entitle him to bind his government in all cases. For example, that role would not entitle an ambassador to bind his government to an obligation collusively entered into between the ambassador and a third party for the third party's benefit. Nor would the foreign government automatically be bound when its ambassador contracts, without actual authority, as to matters far removed from the routine functioning of a diplomatic mission.
 
 
 31
 However, the fact that an ambassador's office does not suffice to authorize him to bind his government in all cases does not inevitably lead to a conclusion that only apparent authority furnishes the appropriate standard whenever, as here, the ambassador/agent lacks actual authority from his government/principal. In addition to actual authority, which may be lacking in this case, and apparent authority, which is now to be explored on remand, there exists what the Restatement of Agency calls "Inherent Agency Power":
 
 
 32
 Inherent agency power is a term used in the restatement of this subject to indicate the power of an agent which is derived not from authority, apparent authority or estoppel, but solely from the agency relation and exists for the protection of persons harmed by or dealing with a servant or other agent.
 
 
 33
 Restatement (Second) of Agency Sec. 8A (1958).
 
 
 34
 Though the circumstances of the government-ambassador relationship are not precisely within the examples of inherent agency power set forth in the Restatement, id. comment b, that relationship is especially suitable for application of this doctrine. An ambassador is accredited to another country so that he will be his government's representative in that country. We are not concerned in this case with the extent of his authority to commit his government on matters of international affairs.[1] Instead, our context concerns only actions of an ambassador dealing with third parties on ordinary commercial matters ostensibly of benefit to his government's ability to maintain its presence in this country. In that context, whether to bind a government by the actions of its ambassador, under the doctrine of inherent agency power, poses this choice: Will the relationships between our government and foreign governments be better served by ensuring that an ambassador can promptly obtain the goods and services needed to operate his embassy or mission, even if on occasion a foreign government is held responsible for incurring obligations his government neither authorized nor condones, or by obliging third parties who supply such goods and services to ascertain from the foreign government in each instance whether the ambassador has actual authority. The latter option strikes me as the one to be avoided.
 
 
 35
 Though the Government of Antigua may find it preferable to tolerate an inquiry into its ambassador's authority in this case if it will thereby obtain a chance to avoid liability for the funds he borrowed, foreign governments generally will not appreciate inquiries from American vendors as to the authority of their ambassadors to obtain goods or services. They send their ambassadors here, as we do to their countries, in the expectation that they can carry out the normal incidents of living in the host country. There is nothing extraordinary about borrowing money to refurbish an embassy, or in this case, a UN mission. And how is the vendor to avoid all risk? It cannot obtain a routine resolution of borrowing authority from a corporation's board of directors. Must it inquire of the foreign ministry, the parliament, the head of state? Or should it examine the internal legal regulations that govern the purchasing and borrowing authority of each country's ambassadors? None of these alternatives seems likely to promote this country's relationships with foreign states.
 
 
 36
 Under the majority's approach, the third party's reliance on the apparent authority of an ambassador remains available, but, as the remand in this case demonstrates, it is an uncertain ground of support. A third party who supplies an embassy (or a UN mission) with champagne or credit expects payment, not an opportunity to persuade a trial court that its ignorance of an ambassador's lack of actual authority was not willful. The majority's unwillingness to recognize an ambassador's inherent authority in this context will, I fear, have the unfortunate consequences of making some vendors unwilling to extend credit for goods and services ordered by embassies and impelling others to make potentially intrusive and resented inquiries of foreign governments. An ambassador may not be "l'etat" for all purposes, but in the context of purporting to obtain goods and services for his country's diplomatic mission, I believe "c'est lui" indeed.
 
 
 37
 The majority suggests that the Restatement 's principle of inherent agency power should not apply to ambassadors because some circumstances can be imagined in which the principle would not apply. If that is a "defect" in the principle or in its application to an ambassador, it is one shared by every legal principle ever announced. In urging that the relationship of an ambassador to his government is one appropriate for the application of the inherent agency principle, I do not suggest that the transaction need not be examined to see if it is one to which the principle applies. In this case, however, there is no claim whatever by Antigua that the bank engaged in any unlawful or even questionable activities with the Ambassador, nor that the bank had any knowledge or basis for suspicion that the Ambassador was not borrowing the money for the stated purposes. Relationships with foreign governments are not put at risk by subjecting those who supply goods and services to foreign embassies to the prospect of an inquiry concerning the legitimacy of the transaction. Whenever a bank lends money, it faces the possibility of subsequent inquiry concerning the bona fides of the transaction. But relationships with foreign governments are put at risk by rules that oblige vendors to probe the relationship of an ambassador to his government in order to avoid the risk of subsequent disputes concerning the ambassador's actual or apparent authority.
 
 
 38
 In any event, we ought not to reject inherent authority in this context without having the benefit of the views of the Executive Branch officially presented to this Court in an amicus curiae brief. We are informed that counsel for Antigua sought to have the State Department present an amicus brief in this case on behalf of Antigua, a request that was declined.
 
 
 39
 Even if this case should be governed solely by the principle of apparent authority, rather than inherent agency power, I fail to see why the judgment of the District Court should not be affirmed. In seeking to vacate the default judgment, Antigua has made no claim nor produced any affidavit that puts in issue the reasonableness of First Fidelity's reliance on the apparent authority of Ambassador Jacobs at the time the funds were borrowed. Any information that First Fidelity may have acquired concerning the need for explicit authorization for the loan from the Antiguan government came to its attention in the course of trying to collect the loan, long after the loan agreement was signed. Since Jacobs indisputably had the apparent authority to bind Antigua to the obligation to repay the funds and since sovereign immunity is not a defense to liability for this commercial transaction, 28 U.S.C. Sec. 1605(a)(2), Antigua should be bound by Jacobs' action in borrowing the funds and by the subsequent default judgment entered upon the repayment obligation.
 
 For these reasons I respectfully dissent.[2]
 
 
 *
 Of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 Antigua asked the United States Department of State to file an amicus curiae brief on its behalf in its appeal to this court. In response, the Legal Advisor declined to file a brief and informally took a position favorable to First Fidelity
 
 
 [2]
 The dissent asserts that, in view of the inherent authority of an ambassador, a foreign state should be bound when the ambassador acts "in the context of purporting to obtain goods and services for his country's diplomatic mission." Dissenting op. at 199. Yet the dissent also recognizes that the state should not automatically be bound if the ambassador collusively entered into an obligation with a third party for the third party's benefit or if the transaction concerned something "far removed from the routine functioning of a diplomatic mission." Id. at 198. These exceptions would swallow the rule of inherent authority proffered by the dissent. Examples that combine both the procedural and the substantive irregularities that the two exceptions guard against are easy to imagine: An ambassador might use embassy funds to purchase cocaine from a drug trafficker--and label the drugs "medical supplies for the embassy." Or an ambassador might borrow money from a bank to invest in a casino--and, with the bank's connivance, secure a favorable rate of interest by pretending that the money would be used to refurbish the embassy.... In other words, there cannot really be a rule of inherent authority that automatically binds a foreign government whenever its ambassador purports to obtain goods and services for the embassy. It must always be possible to look behind the deal
 
 
 [3]
 The Supreme Court has held that the Foreign Sovereign Immunity Act does not affect the substantive law determining the liability of a foreign state. First National City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 620-21, 103 S.Ct. 2591, 2597, 77 L.Ed.2d 46 (1983). We shall assume without deciding here that New York law governs Jacobs' transactions with the bank, although we do not believe that the federal common law rule, were we to follow the suggestion in Judge Newman's dissent, would be any different
 
 
 [1]
 Thus, with deference, I suggest that the majority's citation to cases and to those passages of the Restatement of Foreign Relations concerning actions of an ambassador in the arena or international agreements between nations have little, if any, relevance to this case. It may be entirely appropriate, as the Permanent Court of International Justice held, to examine the entire context in which a foreign minister's disclaimer of sovereignty over disputed territory is made. Legal Status of Eastern Greenland (Den. v. Nor.), 1933 P.C.I.J. (ser. A/B) No. 53 (Apr. 5). And, even in the context of international agreements, the examples cited by the majority do not cast doubt on the appropriateness of binding a government by its ambassador's ordinary commitments to third parties ostensibly made in the course of carrying on the affairs of his diplomatic mission. The coercion of a state's representative, cited in section 331(2)(a) of the Restatement as grounds for permitting a state to invalidate its consent to an international agreement, is simply an example of a defense that is available to a principal because its agent has not acted under circumstances in which the law attaches consequences to his actions, let alone those of his principal. The example of a representative of a negotiating state corrupted by a party to the negotiation, cited in section 331(1)(c) of the Restatement, also has no bearing on whether the law of this country ought to bind governments when their ambassadors deal with third parties on ordinary commercial matters
 The majority maintains that because international agreements have "more dignity" than Ambassador Jacobs' commercial transactions with First Fidelity, the binding effect of his signature on the loan agreement and the stipulation must be less than would arise from his signature on an international agreement. 877 F.2d at 192. I should think the "dignity" factor has precisely the opposite effect. A foreign state needs more insulation when its ambassador purports to commit it to an international treaty than when he orders groceries or borrows money to renovate a diplomatic mission.
 
 
 [2]
 Because I would affirm on the basis of Ambassador Jacobs' inherent authority to borrow the funds and to consent to a judgment settling the claim for collection, I need not consider whether Antigua became bound solely because the stipulation settling the litigation was signed by a lawyer purporting to represent the Government of Antigua