MEMORANDUM OPINION
 

 KAPLAN, District Judge.
 

 On June 10,1996, the Court granted plaintiffs’ motion for summary judgment against defendant ICD Holdings, S.A (“Holdings”) on two promissory notes and against defendants De Geus and Loeffelhardt (the “Guarantors”) on their guarantees of the notes.
 
 Frankel v. ICD Holdings, S.A,
 
 930 F.Supp. 54 (S.D.N.Y.1996)
 
 (“Frankel I
 
 ”). The Guarantors subsequently moved for reargument or, alternatively, for relief from the judgment against them pursuant to Fed.R.Civ.P. 60(b). The Court granted the Guarantors’ motion for a stay of enforcement of the judgment pending the briefing and determination of that motion,
 
 Frankel v. ICD Holdings, S.A,
 
 168 F.R.D. 19 (S.D.N.Y.1996)
 
 (“Frankel II”),
 
 which now is before the Court for decision. The Court assumes familiarity with
 
 Frankel I
 
 and
 
 Frankel II
 
 and therefore limits this discussion to matters essential to clear exposition.
 

 
 *1126
 

 The Motion for Reargument
 

 A motion for reargument is appropriate where “the court overlooked controlling decisions or material factual matters that were before the court on the underlying motion.”
 
 Violette v. Armonk Associates, L.P.,
 
 823 F.Supp. 224, 226 (S.D.N.Y.1993). Its office is “to correct mistakes made because relevant information was disregarded.”
 
 Morin v. Trupin,
 
 823 F.Supp. 201, 205 (S.D.N.Y.1993). No affidavits or new material may be submitted. S.D.N.Y.Crv.R. 3(j). Thus, such a motion is limited to the record that was before the Court on the original motion.
 

 The Guarantors contend that the Court overlooked no less than nine “facts” which, they contend, demonstrate that summary judgment should not have been granted. (Def.Mem. 3^1) Five of the nine “facts” allegedly overlooked are varying formulations of a single proposition: that the Court mistakenly believed that the Preliminary Balance Sheet prepared by Eisner accounted for the so-called “open items”
 
 [1]
 
 or, to put it another way, mistakenly concluded that defendants failed to adduce sufficient evidence to support their contention that it did not.
 
 [2]
 

 Frankel I,
 
 however, clearly stated that the Court assumed in deciding the motion for summary judgment that Eisner did not account for the open items. 930 F.Supp. at 66.
 
 [3]
 
 The basis for the Court’s decision instead was that “there is no legally sufficient basis for concluding that their inclusion
 
 [ie.,
 
 inclusion of the ‘open items’] would have made any material difference.”
 
 Id.
 

 The remaining facts allegedly overlooked by the Court all go to defendants’ assertion that the omission of the “open items” resulted in an $8.7 million overstatement of the purchase price. As is perfectly obvious from a review of defendants’ memorandum and the opinion in
 
 Frankel I,
 
 none of them was overlooked. Indeed, the two most prominent bits of evidence — the Moret reports — were discussed extensively in the decision.
 

 Defendants devote several pages of their memorandum to demonstrating the extent of the work that Moret did in order to render the November 1995 and March 1996 reports and its familiarity with the accounting records and corporate structure of the ICD entities, to rearguing the significance of the statements and disclaimers in the Moret reports, and other such matters. (Def.Mem. 4-10) To a substantial extent, this discussion is based on affidavits submitted in support of defendants’ Rule 60(b) motion that were not before the Court on the motion for summary judgment and that therefore are not properly considered on the motion for reargument. But the result would not change even if the evidence concerning the extent of Moret’s efforts in preparing the November 1995 and March 1996 reports were considered, because it would be quite immaterial. The Court relied upon the contents of the reports in reaching its decision, not upon an assumption as to how many or few hours of work went into their preparation. Hence, while the Court’s comments characterizing the amount of effort devoted by Moret to its activities, considered in light of the materials newly submitted after the decision was rendered, are broader than now seems appropriate, those comments were not material to the result, and the new information would warrant no change.
 

 The motion for reargument is denied.
 

 The Motion to Vacate the Judgment
 

 Defendants seek to vacate the previous judgment on the basis of an affidavit of one of the Moret accountants and a new Moret
 
 *1127
 
 report, dated shortly after the Court rendered its decision. They claim that the recent report is “newly discovered evidence” within the meaning of Fed.R.Civ.P. 60(b)(2). Moreover, they have submitted with their reply papers on this motion still another report, this one from Price Waterhouse & Co., which they commissioned after the Court rendered its decision.
 

 As Rule 60(b) “allows extraordinary judicial relief, it is invoked only upon a showing of exceptional circumstances.”
 
 Nemaizer v. Baker,
 
 793 F.2d 58, 61 (2d Cir.1986). It is not “a substitute for a timely appeal,” and it cannot be used to overcome counsel’s tactical judgments about what evidence to offer.
 
 Id.
 
 at 61, 63;
 
 Martin v. Chemical Bank,
 
 No. 89 Civ. 3946 (LAK), 1996 WL 527336, at *1-2, 940 F.Supp. 56,---(S.D.N.Y.1996). With these principles in mind, there is no basis for relief under Rule 60(b)(2).
 

 The recent Moret report said to constitute newly discovered evidence is dated June 19, 1996. (Goedkoop Aff.Ex. 1) It contains a more detailed statement of what Moret did in order to render the November 1995 and March 1996 reports. It argues that the conclusions of those reports were justified. It argues also, at some length, with the conclusions set forth in the Court’s opinion. Nonetheless, it is crystal clear that all of the factual information contained in the new report — as distinguished from Moret’s rejoinder to the Court’s opinion — existed at the time the motion for summary judgment was briefed and argued. There is no suggestion that new facts had come to light or that Moret had done any work between the time of the Court’s decision on June 10 and the issuance of the new report on June 19 that added anything of substance to what had been done before.
 

 Rule 60(b) may not be used to “relitigate matters settled by the original judgment.”
 
 Donovan v. Sovereign Security, Ltd.,
 
 726 F.2d 55, 60 (2d Cir.1984). In order to gain relief under Rule 60(b)(2), the movant must demonstrate that (1) the newly discovered evidence was of facts that existed at the time of trial or other dispositive proceeding, (2) the movant must have been justifiably ignorant of them despite due diligence, (3) the evidence must be admissible and of such importance that it probably would have changed the outcome, and (4) the evidence must not be merely cumulative or impeaching.
 
 E.g., Weissmann v. Freeman,
 
 120 F.R.D. 474, 476 (S.D.N.Y.1988); 11 Charles Alan Wright, Arthur R. Miller
 
 &
 
 Mary Kay Kane, Federal Practice and Procedure: Civil 2d §§ 2808, 2859 (1995).
 

 Here, all of the material facts in the new Moret report were in existence at the time the original motion was litigated. The facts were known to the defendants, but defendants chose to rely upon the November 1995 and March 1996 Moret reports rather than have Moret prepare a fuller version comparable to the new report. Indeed, as defendants’ counsel stated during the argument of the stay motion, defendants’ counsel simply concluded that they had enough to defeat summary judgment without doing so. (Tr., June 25, 1996, at 22) In these circumstances, granting relief under Rule 60(b)(2) would be an open invitation for litigants to relitigate matters
 
 ad infinitum.
 

 While the foregoing is sufficient to warrant denial of defendants’ motion, the Court bears fully in mind the injunction that the Federal Rules should be construed to secure the just as well as the speedy and inexpensive determination of litigation. In consequence, a few words concerning the merits, in light of the newly proffered evidence, are appropriate.
 

 The parties closed this multimillion dollar acquisition, and the Guarantors guaranteed the notes, on a Preliminary Balance Sheet as at September 30, 1993 that was prepared by Eisner after the execution of the purchase agreement, which, as explained below, obliged them to do so before the Preliminary Balance Sheet even existed. The only defense that the Guarantors advance is fraud
 
 [4]
 
 which, for the reasons explained in
 
 Frankel I,
 
 required them to come forward with admissible evidence sufficient to raise a triable
 
 *1128
 
 issue as to the proposition that the Balance Sheet as at that date would have been materially different had the “open items” — principally the Russian subsidiaries — been accounted for.
 
 [5]
 
 930 F.Supp. at 64-65.
 

 The Court assumed in deciding the original motion that the Eisner-prepared balance sheet did not reflect the equity value of the Russian entities. That omission, assuming it occurred, would have been to the defendants’ disadvantage only if the equity value as at September 30, 1993 was negative in an aggregate amount material to the overall transaction.
 
 [6]
 
 The evidence they offered was the following:
 

 • The assertion of Mr. De Geus, which was based upon the Moret reports of November 1995 and March 1996. (De Geus Aff., Mar. 13, 1996, ¶¶16, 21, 24, 26)
 

 • The November 1995 Moret report.
 
 (Id.
 
 Ex. K)
 

 • The March 1996 Moret report.
 
 (Id.
 
 Ex. 0)
 

 Mr. De Geus’ affidavit was insufficient because he manifestly was not competent to testify to the conclusion that the result of the alleged omission of the equity value of the Russian subsidiaries resulted in any overstatement of the purchase price, let alone a material overstatement. That conclusion, and especially any conclusion as to amount, rested solely on Moret.
 

 The first Moret report reflected estimated net negative equity values for Hisparus and AOZT, the two Russian companies, as at September 30, 1996 of $3,844,370 and $827,-090, respectively.
 
 (Id.
 
 Ex. K and Exhibit 1 thereto) These were not figures derived by Moret, however. Rather, the report clearly stated that they were the product of a calculation by defendants’ financial department made to approximate the September 30,1993 equity values.
 
 [7]
 

 (Id.
 
 at 2) The second Moret report used identical figures, except that it added an additional $3,293,280 to the negative equity value of AOZT.
 
 [8]
 

 (Id.
 
 Exs. O, M
 
 [9]
 
 )
 

 What is critical, however, is what Moret did and did not say about the defendants’ calculations. While Moret said in the first report that the
 
 procedures
 
 used by defendants, “given the circumstances, [were] acceptable”
 
 (id.
 
 Ex. K, at 2), it said also that it
 
 *1129
 
 did “not express an opinion” and that it made “no representations regarding the sufficiency of the foregoing procedures for [defendants’] purposes
 
 (id
 
 at 2-3).” There is no suggestion that the data and assumptions to which defendants’ procedures were applied were complete, accurate or reliable. The only reasonable construction of this language is that Moret was not prepared to say that, in its opinion, the result of management’s calculations was a fair approximation of the equity values of the subsidiaries as of the relevant date.
 

 Both the accuracy of this construction and the reasons for it are crystal clear from Moret’s second report. Moret there said, among other things, that (1) its work was “designed to be responsive to management’s objectives ...(2) it had “no opinion” as to whether its procedures were adequate for management’s purposes, which were in relevant part to establish the equity value of the Russian subsidiaries at the relevant date, (3) it would
 
 “not express an opinion on the completeness and correctness of the calculation underlying the draft settlement,”
 
 which set forth these figures, and (4) it did “not express an audit opinion” as to the figure used for the negative equity value of AOZT.
 
 [10]
 

 (Id.
 
 Ex. 0) (emphasis added) Hence, whatever the meaning of the word “acceptable” in Moret’s report, which in any case applied only to the procedures used and not to the end result, nowhere in the record on the original motion was there any opinion — by a competent witness in admissible form as required by Fed.R.Civ.P. 56 — as to the dollar amount, if any, by which the Balance Sheet overstated the book value of the relevant assets or the purchase price.
 

 The submissions in support of the Rule 60(b) motion, all of which could have been made before the summary judgment motion was decided,
 
 [11]
 
 do add a bit — but only a bit— to the defendants’ position.
 
 [12]
 
 They include another affidavit from Mr. Goedkoop, the Moret accountant, which conspicuously fails to give any opinion as to what the purchase price, computed in accordance with the contract, should have been. And they undercut defendants in another, most important respect.
 

 Whereas the calculation prepared by defendants and reviewed by Moret attributed a total negative equity value to AOZT of $4,120,370 ($827,090 plus the $3,293,280 addition attributed to the allegedly worthless account payable to the Buyer), Price Water-house came up with a total figure of $826,800, none of it attributable to the allegedly uncollectible account. (Piantidosi Reply Deel.Ex. A, at 5-9) The result of this and other, far less significant, differences between Price Waterhouse and the defendants’ figures that were reviewed by Moret is that the total alleged overstatement, according to Price Waterhouse, was $5.4 million — $3.3 million less than defendants originally claimed in this action. And this difference is extremely important.
 

 It must be borne in mind that defendants’ fraud theory is not simply that the Balance Sheet in some sense was incorrect or, indeed, that it was off by an amount that would be significant to most people. While such an error might well give defendants a claim for a refund of part of the purchase price, the Guarantors can avoid their guarantees of the notes only if they can establish
 
 *1130
 
 that they would not have signed the guarantees if they had known the true state of affairs.
 
 [13]
 
 And on this point, the structure of the contract is critical.
 

 The purchase agreement, dated January 4, 1994, provided for the purchase of the company for Book Value less $900,000,
 
 [14]
 
 the price payable in the form of (1) guaranteed notes aggregating $5 million, and (2) cash for the difference. Any variation in the Book Value thus would have resulted in a change only in the cash paid at the closing, the Estimated Cash Purchase Price not in the amount of the notes. The notes and guarantees could have been affected only in one way: the purchase agreement gave both sides the right to call off the deal before the notes and guarantees were signed if the Estimated Cash Purchase Price — the book value shown on the Preliminary Balance Sheet less the $900,000 contractual discount less the $5 million in notes — varied by more than 10 percent from $67.8 million.
 
 Frankel I,
 
 930 F.Supp. at 56-57. Thus, if the book value shown on the Preliminary Balance Sheet minus $5.9 million was less than $61.02 million or greater than $74.58 million, the Buyers could have walked away. Otherwise, Holdings was obliged to sign the notes and the Guarantors to sign the guarantees. Hence, any overstatement of less than $6.78 million would have been immaterial to the contractual obligations of Holders and the Guarantors to execute and guarantee the notes, respectively.
 

 This is confirmed by Mr. De Geus in his original papers in opposition to the motion for summary judgment. He there asserted that the importance of the alleged overstatement of the book value lay in Buyers’ ability to cancel the deal if the Estimated Cash Purchase Price dropped beneath the contractual floor. Because the defendants’ caieulation at that time purported to show an $8.7 million overstatement, which was well over 10 percent of $67.8 million, Mr. De Geus argued that disclosure of the true state of affairs would have resulted in the defendants declining to proceed and thus declining to execute the notes and guarantees. (De Geus Aff., Mar. 13, 1996, ¶¶ 11, 16-17, 22, 26; De Geus Reply Aff., Apr. 4,1996, ¶¶ 3-4)
 

 The foregoing demonstrates that plaintiffs would be entitled to summary judgment even if the Price Waterhouse report were properly considered “newly discovered evidence” under Rule 60(b)(2) and is competent and admissible for summary judgment purposes. The amount of the overstatement Price Waterhouse alleges is too low to have been material to the notes and guarantees.
 

 This, of course, is not to say that the Guarantors have no forum or remedy for the alleged overpayment. They already have brought an independent action seeking to recover the alleged overpayment.
 
 [15]
 
 And it is important to emphasize that there is no inequity in enforcing the guarantees and thereby requiring the payment of disputed sums pending the outcome of the defendants’ affirmative claim.
 

 As the Court has commented previously, acquisitions and dispositions of businesses for prices that depend on the results of accounting procedures are fraught with the risk of post-closing disagreements about accounting matters. Where part of the price is to be paid after the closing, the seller almost invariably must contemplate the risk that the buyer will claim that the price should be adjusted and seek to withhold any unpaid portion. The buyer, for exactly the same reason, must contemplate the possibility that the seller will demand payment of any unpaid portion of the purchase price notwithstanding the buyer’s view that it has paid too much
 
 *1131
 
 already or, at any rate, that the seller is not entitled to the balance.
 

 Attorneys who represent parties to such transactions have a variety of means at their disposal to protect the conflicting interests of buyers and sellers in this respect, assuming of course that their respective clients are successful in securing the agreement of their opposite numbers. At one end of the spectrum, a contract may provide that the buyer’s obligation to pay any balance due after closing arises only after authoritative resolution of any dispute as to the price, whether by litigation or arbitration. At the other end of the spectrum would be a contract that provided that the buyer would pay all amounts claimed by the seller immediately, subject to the buyer’s right to sue for a refund.
 
 See Frankel I,
 
 980 F.Supp. at 61. & n. 7 (citing cases). There is a myriad of techniques that fall between these poles, including the method agreed upon here — guaranteed promissory notes in which the maker, but not the guarantors, waived substantially all defenses.
 

 The effect of the maker’s waiver, as the Court held in
 
 Frankel I,
 
 was unequivocally to require that Holdings pay the $5 million principal amount of the notes irrespective of any dispute as to the price. While the Guarantors did not waive defenses, the very fact that they guaranteed notes for liquidated amounts materially affected their right to withhold payment pending resolution of this dispute. The plaintiffs, as holders of the notes, were able to make out their case in chief by proving the notes, the guarantees, and the fact of non-payment. At that point, the burden shifted to the Guarantors, for reasons explained in
 
 Frankel I,
 
 to adduce competent and admissible evidence raising a genuine issue of fact as to a material misrepresentation, a burden they did not carry.
 

 The situation of course would have been quite different if the deal had been structured otherwise. The contract might have provided that the buyers would pay a fixed sum at closing and make a post-closing payment equal to the difference between the purehase price and the amount paid at the closing. In those circumstances, the plaintiffs would have borne the burden of proving the purchase price as that term was defined in the contract. The defendants’ ability to demonstrate the existence of genuine issues of material fact as to the purchase price would have been appreciably greater than their ability to defeat a summary judgment motion on the guarantees. But that is not the deal the parties made. It would be entirely inappropriate for the Court to rewrite the bargain — particularly where, as here, the transaction involved a $400 million a year business and the parties were sophisticated and had access to competent counsel.
 

 Conclusion
 

 For the foregoing reasons, the motions are denied in all respects. Moreover, in view of the protean nature of defendants’ claims as to the extent of the alleged overstatement, the fact that the Guarantors were involved intimately in this business prior to the buy out, the fact that the Guarantors are foreign nationals whose assets are not readily reachable to satisfy a judgment in the event plaintiffs ultimately prevail, the dependence of all of defendants’ accountants on subjective representations of the defendants as to matters affecting the amount of any claimed overstatement,
 
 [16]
 
 and that Price Waterhouse’s work depends upon the parent company’s “shadow bookkeeping,” the Court would exercise its power under Rule 60(b) to impose conditions on any exercise of its power to vacate the judgment. Specifically, it would condition vacatur of the judgment as to the Guarantors upon the Guarantors posting a bond or giving other security approved by the Court in the principal amount of the Notes plus all interest accrued thereon to date plus an additional 15 percent.
 
 See First Fidelity Bank, N.A. v. The Government of Antigua and Barbuda
 
 —Permanent
 
 Mission,
 
 877 F.2d 189 (2d Cir.1989) (conditioning vacatur of judgment on posting security);
 
 Sales
 
 
 *1132
 

 v. Republic of Uganda,
 
 828 F.Supp. 1032 (S.D.N.Y.1993) (same).
 

 SO ORDERED.
 

 [1]
 

 . The first three and the final two of the nine “facts” listed at pages 3-4 of defendants' memorandum fall into this category.
 

 [2]
 

 . Defendants complain that plaintiffs failed to demonstrate that Eisner did account for the "open items.” That of cotuse is accurate but immaterial. Plaintiffs sued on promissory notes and guarantees. Once they established the lack of a triable issue of fact as to the elements of their case in chief — the execution and authenticity of the instruments sued upon and nonpayment, none of which was contested — the burden shifted to the defendants to adduce admissible evidence sufficient to raise a triable issue as to their affirmative defense.
 
 Franlcel I,
 
 930 F.Supp. at 64-65. Plaintiffs never bore the burden, on the underlying motion, as to what Eisner did or did not account for.
 

 [3]
 

 . The Court reiterated the point at the argument of the stay motion. (Tr., June 25, 1996, at 5)
 

 [4]
 

 . They rely also on failure of consideration. As explained in
 
 Frankel I,
 
 however, there is no material difference in this case between fraud and failure of consideration. 930 F.Supp. at 64 n. 9.
 

 [5]
 

 . In fact, it now appears that Moret was incorrect in characterizing the alleged failure to reflect the equity value of the Russian subsidiaries, the principal bone of contention here, in the Balance Sheet as a failure to account for "open items” as that term was used in the Agreement.
 
 (See
 
 De Geus Aff., Mar. 13, 1996, Exs. D § 6.03(4), E) Rather, their equity should have been consolidated into the Balance Sheet because they were Retained Businesses as that term was defined in the Agreement.
 
 (Id.
 
 Ex. D §§ 1.03(a), 1.04(a), 1.06 & Ex. 1.06 thereto;
 
 accord,
 
 Piantidosi Reply Decl. ¶ 3 & Ex. A, at 1, 3-11, 15) It has been clear throughout, however, that the defendants’ principal difficulty with the Balance Sheet was its alleged failure to reflect the equity value of the Russian subsidiaries. Hence, it is of no significance whether it should have done so because they were Retained Businesses or "open items."
 

 [6]
 

 . If the equity value was positive, the failure to reflect that value in the balance sheet would have resulted in an underpayment by the Buyers.
 

 [7]
 

 . The defendants’ calculations, which are attached to the first Moret report, show that the negative equity value attributed to Hisparus was principally the sum of (1) a provision
 
 (i.e.,
 
 downward adjustment in equity) for Russian value added tax (“VAT”), and (2) the estimated loss for the period January 1 through September 30, 1993.
 
 (Id.
 
 Ex. 1) They show also that the negative equity value attributed to AOZT was almost entirely attributable to a provision for VAT.
 
 (Id.
 
 Ex. 2) Moreover, the defendants’ calculations show on their face that the loss attributed to Hisparus for the first nine months of 1993 is simply nine-twelfths of the loss for the entire year as distinguished from a true profit and loss calculation for the nine month period, which would match revenues and expenses to that period as distinct from the rest of the year. The recent (post-decision) Moret report makes clear that the reason for the lack of true profit and loss figures for the nine month period is the inability to establish an accounting cutoff as of September 30, 1993.
 

 [8]
 

 . This figure, also prepared by the defendants, was derived by (1) taking as a given a $31,835,-000 account payable by AOZT to the Buyer as of November 30, 1995, and (2) allocating 3/29ths of that total to the period through September 30, 1993 on the theory that 3/29ths of entire duration of AOZT’s existence occurred during that period.
 

 [9]
 

 . Defendants’ counsel has represented that Exhibit M to the De Geus affidavit is the "draft settlement” referred to in the second Moret report, Exhibit O. (Def.Mem. 4) This appears to be undisputed.
 

 [10]
 

 . In view of these statements in the Moret reports, Mr. Goedkoop’s assertion in his affidavit in support of the present motion that Moret was not unwilling to render an opinion (Goedkoop Aff., June 19, 1996, ¶ 17) is incomprehensible. Moreover, the fact that Eisner disclaimed opinions in rendering the Preliminary and Closing Balance Sheets, a fact relied upon by defendants, is a red herring. Eisner's work product was not obliged to meet the standard required of evidence offered to defeat a well grounded motion for summaty judgment.
 

 [11]
 

 . Indeed, there is no reason that Price Water-house could not have been retained and its report generated prior to decision on the motion. Certainly it did not rely on facts or evidence that did not exist in that time period.
 

 [12]
 

 . In this category are the newly expressed opinions of both Moret and Price Waterhouse that the allocation of half of AOZT’s 1993 loss to the period ending September 30, 1993 — AOZT functioned during 1993 only from July 1 through December 31 — was appropriate in the circumstances. (Goedkoop Aff., June 19, 1996, Ex. 1, at 5; De Geus Aff., Mar. 13, 1996, Ex. K Ex. 2; Piantidosi Reply Deck Ex. A, at 6)
 

 [13]
 

 .
 
 E.g. Sheffield Comm. Corp. v. Clemente,
 
 792 F.2d 282, 285 (2d Cir.1986);
 
 United States ex rel. Roman v. Schlesinger,
 
 404 F.Supp. 77, 85 (E.D.N.Y.1975);
 
 Jones v. Title Guar. & Trust Co.,
 
 277 N.Y. 415, 419; 14 N.E.2d 459 (1938);
 
 First Nationwide Bank v. 965 Amsterdam, Inc.,
 
 212 A.D.2d 469, 623 N.Y.S.2d 200, 201-02 (1st Dept. 1995).
 

 [14]
 

 . The Book Value was subject also to certain adjustments, which also affected the purchase price. The amount of those adjustments is not material in this case. The Court therefore refers to the purchase price as Book Value less $900,-000 for ease of expression.
 

 [15]
 

 . The amount of the alleged overpayment actually made to date of course is $5 million less than it will be when the notes are paid. Defendants doubtless will be permitted to supplement their complaint to seek recovery of the full amount of any alleged overpayment.
 

 [16]
 

 . These include representations, for example, as to the collectibility of alleged overpayments of Russian VAT, the allocation of losses to particular accounting periods and the fact that AOZT did not maintain accounting records that manifestly would be material here.