**ICD HOLDINGS S.A., Plaintiff,**

v.

**Alfred M. FRANKEL, et al., Defendants.**

**No. 96 CIV. 2499(LAK).**

United States District Court, S.D. New York.

Sept. 5, 1997.

Robert A. Weiner, Y. David Scharf, Mary E. Mullin, McDermott, Will & Emery, for Plaintiff.

Ira S. Sacks, Alex Lipman, Daniel L. Abrams, Fried, Frank, Harris, Shriver & Jacobson, for Defendants Alfred M. Frankel and Jacques Leviant.

Claude M. Tusk, David S. Hoffner, Shereff, Friedman, Hoffman & Goodman, LLP, for Defendant Richard A. Eisner & Co.

## MEMORANDUM OPINION

KAPLAN, District Judge.

The plaintiff in this case was the purchasing vehicle in a 1994 management buyout of ICD, Inc. ("ICD"), a large international dealer in petrochemical based commodities. It brings this action against Alfred M. Frankel and Jacques Leviant, who sold the ICD shares to plaintiff, and Richard A. Eisner & Co. ("Eisner"), certified public accountants who prepared certain materials contemplated by the purchase agreement for use in determining the price. All defendants move to dismiss the complaint.

### Facts

This is the second action concerning this transaction, the first having occasioned three opinions by this Court that set out the pertinent aspects of the purchase agreement and the nature of the dispute between the buyer and the sellers.[1] There is, in consequence, no need to repeat any of that discussion here, and the Court will assume familiarity with the prior opinions. It is important, however, to focus on the nature and procedural history of the prior action in view of the former adjudication arguments raised by the defendants here.

### The Prior Action

In brief summary, the plaintiff in this case, ICD Holdings S.A. ("Holdings"), purchased all of the shares of ICD from Frankel and Leviant for (1) $5 million in promissory notes, and (2) cash equal to the Book Value, as defined by the purchase agreement, less $5.9 million. The notes were guaranteed by Holdings' two shareholders, Messrs. deGeus and Löffelhardt. The overall purchase price was subject to a post-closing adjustment in which the buyer or the sellers, as the case might be, would pay to the other any amount necessary to adjust the consideration transferred at the closing to an amount equal to the adjusted purchase price.

---

1. *Frankel v. ICD Holdings S.A.*, 939 F.Supp. 1124 (S.D.N.Y.1996) ("*Frankel II*") (denying defendants' Rule 60(b) motion); *Frankel v. ICD Holdings S.A.*, 930 F.Supp. 54 (S.D.N.Y.1996) ("*Frankel I*") (granting plaintiffs' motion for summary judgment on promissory notes and guarantees); *Frankel v. ICD Holdings S.A.*, 168 F.R.D. 19 (S.D.N.Y.1996) (denying stay and reargument).

A dispute concerning the purchase price developed following the closing. Holdings then defaulted on the notes. In consequence, Frankel and Leviant sued Holdings and deGeus and Löffelhardt on the notes and guarantees, respectively, in New York Supreme Court. Holdings, deGeus and Löffelhardt removed that prior action to this Court.

The prior action was commenced not by the filing of a complaint, but by the service of a motion for summary judgment in lieu of complaint as permitted in such cases by Section 3213 of the New York Civil Practice Law and Rules. As there was no complaint, Holdings, deGeus and Löffelhardt filed no answer.[2] Rather, they responded to the motion for summary judgment, contending, by way of defense, that Frankel and Leviant fraudulently had overstated the purchase price.

In *Frankel I*, this Court held that Holdings, by the terms of the notes it had signed, waived the defense of fraud in the inducement of the notes.[3] While it held that deGeus and Löffelhardt had not waived such a defense to the guarantees, it went on to conclude that they had not raised a genuine issue of fact as to the existence of any material overstatement of the purchase price and therefore granted summary judgment on the notes and guarantees.[4] It is important, moreover, to focus on the precise nature of the fraudulent inducement defense asserted by deGeus and Löffelhardt and on the basis for the Court's ruling.

The structure of this buyout transaction was complex. The purchase agreement, which is the document that obliged deGeus and Löffelhardt to execute their guarantees at the closing, conditioned their obligation to do so (as well as the obligation of Holdings to proceed with the purchase) on the receipt of a preliminary balance sheet showing the Estimated Cash Purchase Price—the Book Value as defined less $5.9 million—to be within ten percent of $67.8 million.[5] In other words, if the Estimated Cash Purchase Price, determined in accordance with the purchase agreement, had been less than $61.02 million or more than $74.58 million, Holdings, deGeus and Löffelhardt would have had the right to walk away from the deal. The accountant's statement that was delivered at or prior to the closing—and that allegedly was overstated—showed an Estimated Cash Purchase Price of $64.9 million and thus fell within the range in which the buyer and guarantors were obliged to proceed with the transaction.

In order to defeat the buyers' motion for summary judgment on the guarantees, *Frankel I* held, deGeus and Löffelhardt were obliged to adduce evidence sufficient to raise a genuine issue of fact as to the existence of a material overstatement of the Estimated Cash Purchase Price.[6] It concluded that they had not done so, "principally because the evidence is insufficient to permit the inference that properly prepared balance sheets as at September 30, 1993 would vary materially from those [the accountant] prepared."[7]

DeGeus and Löffelhardt sought relief from the judgment under Rule 60(b)(2), relying on additional accounting evidence in support of their position that there had been a material overstatement. Among the evidence proffered was an opinion of a Price Waterhouse

---

**2.** Fed.R.Civ.P. 7(a) provides that there shall be a complaint, an answer and, insofar as is relevant here, "[n]o other pleading." Fed.R.Civ.P. 12(b) provides, with exceptions not here relevant, that "[e]very defense, in law or fact, to a claim for relief *in any pleading* . . . shall be asserted in the responsive pleading thereto if one is required. . . ." (Emphasis added) Fed.R.Civ.P. 13(a) provides that "[a] *pleading* shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against the opposing party . . ." (Emphasis added) As there was no complaint, no answer was required. As no answer was required, the compulsory counterclaim rule did not have its usual effect of requiring the defendants to assert any claims they might have had against the plaintiffs which arose out of the transaction or occurrence that was the subject matter of the plaintiffs' action.

**3.** 930 F.Supp. at 61–63.

**4.** *Id.* at 64–67.

**5.** *Id.* at 56.

**6.** *Id.* at 64–66.

**7.** *Id.* at 66.

& Co. accountant, solicited after the date of the decision in *Frankel I*, to the effect that there had been an overstatement of the Estimated Cash Purchase Price of $5.4 million.[8] The Court, however, denied the motion on the alternative grounds that (i) the evidence had been available to deGeus and Löffelhardt when the original motion had been litigated and, (ii) in any case, was immaterial given the structure of the purchase agreement. The Court noted "the Guarantors can avoid their guarantees ... only if they can establish that they would not have signed the guarantees if they had known the true state of affairs." [9] They were obliged by the purchase agreement to execute and deliver the guarantees provided the Estimated Cash Purchase Price fell anywhere within a broad range. The Court went on to say that the amount of the overstatement alleged by Price Waterhouse was less than the $6.78 million that the Court regarded as necessary to have given Holdings, deGeus and Löffelhardt the right to walk away from the deal.[10] The Court indicated also, however, that a smaller "error might well give [the Guarantors] a claim for a refund of part of the purchase price ..." [11]

### The Complaint in this Action

This action was commenced during the pendency of the prior action.[12] The amended complaint, unsurprisingly, tells essentially the same story that Holdings, deGeus and Löffelhardt advanced in their effort to defeat summary judgment on the notes and guarantees save that Eisner here is a party to the suit. The complaint contains ten causes of action. The first through third seek damages against Frankel and Leviant for breach of contract on various theories. The fourth through sixth charge Frankel, Leviant and Eisner with common law fraud, negligent misrepresentation and securities fraud, respectively. The seventh accuses Eisner of aiding and abetting the alleged fraud by Frankel and Leviant. The eighth through tenth allege that Eisner breached its alleged contractual and fiduciary obligations to Holdings and committed professional malpractice.

### Discussion

#### I. Former Adjudication

Frankel and Leviant move to dismiss the entire complaint on the grounds that all of Holdings' claims are barred by both issue and claim preclusion, often referred to as collateral estoppel and *res judicata*, respectively. Eisner contends that Holdings' fraud, aiding and abetting and negligent misrepresentation claims must be dismissed on the basis of issue preclusion.[13]

#### A. Issue Preclusion

■ The fraud claims asserted here depend upon the allegation that the defendants made six misrepresentations to Holdings: that (1) Eisner would act independently, (2) Eisner would prepare the balance sheet in accordance with U.S. generally accepted accounting principles ("GAAP"), (3) Eisner would perform an audit or special procedures with respect to ICD and the retained subsidiaries, (4) the Estimated Book Value, as of September 30, 1993, was $70,573,766, (5) the Estimated Cash Purchase Price was $64,933,-450, and (6) the 1992 financial statements were materially correct.[14] In fact, Holdings alleges, the Estimated Cash Purchase Price, accurately stated, would have been approximately $55,573,450 million, a figure that would have permitted it to walk away from the deal; the Estimated Book Value was overstated by about $9.3 million; Eisner was not independent and did not prepare the balance sheet in accordance with GAAP; and

---

8. *Frankel II,* 939 F.Supp. at 1129.

9. *Id.* at 1129–30 (citing *Sheffield Comm. Corp. v. Clemente,* 792 F.2d 282, 285 (2d Cir.1986); *United States ex rel. Roman v. Schlesinger,* 404 F.Supp. 77, 85 (E.D.N.Y.1975); *Jones v. Title Guar. & Trust Co.,* 277 N.Y. 415, 419, 14 N.E.2d 459 (1938); *First Nationwide Bank v. 965 Amsterdam, Inc.,* 212 A.D.2d 469, 623 N.Y.S.2d 200, 201–02 (1st Dept.1995)).

10. *Id.* at 1130.

11. *Id.*

12. *See id.* at 1130 & n. 15.

13. Eisner Mem. 14.

14. Am.Cpt. ¶ 80.

the 1992 financial statements were inaccurate.

All of the defendants contend that the Court's rulings in *Frankel I* decided these issues against Holdings and that these claims therefore must be dismissed. In addition, Frankel and Leviant argue that the breach of contract claims against them are based on one of two theories: either (1) there was a misrepresentation of the book value of the businesses on the balance sheet or (2) there was a breach of the purchase agreement in failing to account for the transaction in accordance with its terms. The rejection of the fraud defense asserted in *Frankel I*, they contend, precludes Holdings from establishing either theory and requires dismissal of the contract claims as well.

 Litigants who have had a full and fair opportunity to litigate ordinarily will not be heard to relitigate an issue actually, finally and necessarily decided against them in a prior action. In order for this doctrine of issue preclusion to apply, four requirements must be satisfied:

> "(1) the issues in both proceedings must be identical (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a final judgment on the merits." [15]

It therefore is essential to determine at the outset exactly what *Frankel I* actually and necessarily decided.

### 1. Actually and Necessarily Decided

As described, the prior action, insofar as it dealt with the fraud defense on its merits, was a suit by Frankel and Leviant against deGeus and Löffelhardt on their guarantees. As a matter of law, deGeus and Löffelhardt could have avoided the guarantees only if they had raised a genuine issue of fact as to

the existence of an overstatement of the Estimated Cash Purchase Price of sufficient magnitude that disclosure of the truth would have given them the right to decline to execute the guarantees of the $5 million in notes at the Closing.[16] This Court actually and necessarily decided that they had failed to do so and, in consequence, entered judgment on the guarantees. No broader holding, however, was required to dispose of the fraud defense. Nor did the Court make any determination with respect to the 1992 financial statements, which were not at issue in the prior action, or regarding Eisner's actions.

Frankel and Leviant argue that the Court previously determined that there were no material misrepresentations in connection with the purchase agreement. They place great emphasis on the Court's statement in *Frankel I* that "[t]he evidence is insufficient to permit the inference that properly prepared balance sheets as at September 30, 1993 would vary materially from those Eisner prepared." [17] They come to an erroneous conclusion, however, because they take the word "materially," as used by this Court in the prior action, out of context.

In ordinary circumstances, the test of materiality, broadly speaking, is whether an alleged misstatement or omission would have been important to a reasonable buyer or seller.[18] But the issue in the prior action was different. As the Court carefully pointed out, in the unique context of the guarantors' defense to the action on the guarantees, the issue was whether they had raised a genuine issue as to the existence of an overstatement of the Estimated Cash Purchase Price of sufficient magnitude that disclosure of the true figure prior to closing would have relieved them of the obligation to guarantee the notes. The Court placed the size of the necessary overstatement at $6.78 million. Hence, the Court's holding was that there was insufficient evidence of a misstatement *of that magnitude*. Accordingly, the holding in

---

**15.** *Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38, 44 (2d Cir.1986), *cert. denied,* 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987).

**16.** *Frankel II,* 939 F.Supp. at 1129–30 & n. 13.

**17.** Frankel Mem. 6 (quoting *Frankel I,* 930 F.Supp. at 66).

**18.** *See, e.g., TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

the prior action actually and necessarily determined only that any overstatement of the Estimated Cash Purchase Price, if any there was, did not exceed $6.78 million. That is the limit of any issue preclusive effect of the prior judgment.[19]

### 2. Identity of Issues

Holdings would have the Court go further. It contends that the prior judgment can have no issue preclusive effect because the requisite identity of issues is absent.[20] They contend that their fraud claim in this case, unlike that in the prior action, includes an assertion that the Book Value was overstated by the same $7.5 million as the Estimated Cash Purchase Price, which resulted in deGeus and Löffelhardt obtaining financing without which they could have walked away from the deal independent of the alleged variance in the Estimated Cash Purchase Price.[21] They argue also that the standards of proof of fraud in the two actions and the issues here on the contract and negligent misrepresentation claims all are different. These arguments both are without merit.

To begin with, the alleged overstatement of the Estimated Cash Purchase Price and the Book Value are one and the same. The Estimated Cash Purchase Price was defined in the purchase agreement as the purchase price less the $5 million in notes.[22] The purchase price was defined as the Book Value less $900,000 plus an additional contingent purchase price.[23] As there was no dispute in the prior action about the amount of the notes, the $900,000 subtraction, or the additional contingent purchase price, the Court's determination that the Estimated Cash Purchase Price was not overstated by more than $6.78 million was the logical equivalent of a determination that the Book Value was not overstated by more than $6.78 million. Hence, the first of Holdings' contentions is baseless.

The differences between the elements of the contract and negligent misrepresentation claims in this case and the fraud defense on the guarantees is of no greater help to Holdings. Differences there certainly are. To the extent, however, that Holdings claims that the Book Value and Estimated Cash Purchase Price were overstated by $7.5 million, proof of an overstatement in excess of $6.78 million is essential to Holdings' complete success and, to the extent the claim exceeds that amount, identical to the issue in the prior action.

Holdings' contention that there can be no issue preclusion because of the allegedly higher standard of proof it claims applied in the prior action fares no better. New York, to be sure, requires that one seeking recovery for fraud prove his or her case by clear and convincing evidence.[24] While the issue is not as clear, there is at least some authority for the proposition that the defense of fraudulent inducement requires proof by the same standard.[25] And it is well established that

19. Although neither side has raised the matter, either in the prior action or in this one, the Court on reflection has concluded that the $6.78 million figure was incorrect. The Court previously and correctly determined that deGeus and Löffelhardt would have been relieved of their obligation to give the guarantees if the Estimated Cash Purchase Price, properly computed, had been less than $61.02 million, which was the lower limit of the ten percent "collar" around the benchmark figure of $67.8 million. As the Estimated Cash Purchase Price in the preliminary balance sheet that Eisner delivered was $64.9 million, however, proof of a fraudulent overstatement of more than $3.9 million would have been sufficient to defeat the claim on the guarantees.

The fact that the prior figure was incorrect does not affect the preclusion analysis. The point of the rules of preclusion is to bring an end to litigation. Error does not defeat the preclusive effect of the prior judgment. E.g., RESTATEMENT(SECOND)JUDGMENTS § 17, cmt. d (1982).

20. Holdings Mem. at 4–13.

21. Id. at 6; Am.Cpt. ¶ 47.

22. Frankel I, 930 F.Supp. at 57.

23. Id. at 56.

24. E.g., Simcuski v. Saeli, 44 N.Y.2d 442, 452, 406 N.Y.S.2d 259, 265, 377 N.E.2d 713, 718–19 (1978).

25. The governing decision of the New York Court of Appeals holds that one seeking to avoid the obligation of a contract on the basis of fraudulent inducement must prove fraud "by most satisfac-

preclusion may not be asserted against a party unsuccessful in a prior action where that party faced a significantly higher burden of persuasion than is required in the subsequent action.[26] The difficulty with the argument, however, is twofold.

First, the prior action was litigated without regard to the allegedly higher burden of proof of fraud. Neither party asserted that the defense of fraud in the inducement of the guarantees was governed by the clear and convincing evidence standard, and the Court decided the case on the basis that no reasonable trier of fact could have inferred, by a preponderance of the evidence, that there was an overstatement of the purchase price of more than $6.78 million. While the Court's assumption as to the standard of proof, in consequence of the parties' silence, may or may not have reflected accurately the

law of New York, that in fact was the basis of the decision.[27]

Second, even if the prior action were regarded as establishing only that deGeus and Löffelhardt had failed to establish fraud by clear and convincing evidence, that same clear and convincing standard clearly applies to their fourth and seventh causes of action in this case and at least arguably applies to their other causes of action which incorporate the allegations of fraud.

### 3. Actually Litigated

Finally, Holdings contends that this Court did not reach the merits of Holdings' fraud claim in the prior action because it concluded that Holdings waived the defense of fraud in the promissory notes. In substance, the argument is that the prior determination may bind deGeus and Löffelhardt, but not Holdings.[28] The argument, however, is frivolous.

tory evidence." *Adams v. Gillig*, 199 N.Y. 314, 323, 92 N.E. 670 (1910). The Third Department has construed this to mean proof by clear and convincing, rather than a preponderance of the, evidence. *Mix v. Neff* 99 A.D.2d 180, 183, 473 N.Y.S.2d 31, 33 (3d Dept.1984).

**26.** *E.g., United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361–62, 104 S.Ct. 1099, 1104–05, 79 L.Ed.2d 361 (1984) (acquittal on criminal charges not preclusive in subsequent civil action involving the same issue); Restatement (Second) of Judgments § 28(4) (1982).

**27.** Frankel and Leviant contend also that the possible difference in the burden of persuasion is of no moment in light of *Murphy v. Gallagher*, 761 F.2d 878 (2d Cir.1985), and *Tobias v. First City Nat'l Bank and Trust Co.*, 709 F.Supp. 1266 (S.D.N.Y.1989). *See also Deutsch v. Integrated Barter Int'l, Inc.*, 700 F.Supp. 194, 198 (S.D.N.Y. 1988) (holding that the clear and convincing and preponderance of the evidence standards "are not so disparate ... as to foreclose collateral estoppel."). They are in error.

*Murphy*, it is true, held that a prior state court judgment adverse to the plaintiff on a common law fraud claim precluded the plaintiff's subsequent federal securities fraud action although it well could have been argued that the state court action had been governed by a higher burden of persuasion. But there are two problems with ascribing to *Murphy* in this case the significance attached to it by Frankel and Leviant.

First, *Murphy* involved the preclusive effect of a prior state court judgment, a question governed by the law of the state that rendered the judgment. *E.g., McDonald v. City of West*

Branch, Mich., 466 U.S. 284, 287, 104 S.Ct. 1799, 1801, 80 L.Ed.2d 302 (1984); *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984); *Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 415–16, 66 L.Ed.2d 308 (1980); 28 U.S.C. § 1738. Here, on the other hand, the issue is the preclusive effect of a prior federal court judgment, which is governed by federal rather than New York law. *Nycal Corp. v. Inoco PLC*, 968 F.Supp. 147, 150 (S.D.N.Y. 1997); *Prudential Sec., Inc. v. Arain*, 930 F.Supp. 151, 155–56 (S.D.N.Y.1996); *B.N.E. Swedbank, S.A.v. Banker*, 791 F.Supp. 1002 (S.D.N.Y.1992); *see Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 345 n. 1 (2d Cir.1995). Hence, even if the New York law on this point is as Frankel and Leviant claim, and even if *Murphy* so held, the matter is controlled by federal rather than state law. Second, it is quite doubtful that *Murphy* so construed the law of New York. The question of differing burdens of persuasion and its significance for former adjudication purposes was not discussed in the panel's opinion. Nor has the Court's attention been called to any New York State decision holding that the existence of a higher burden of persuasion in a prior litigation does not affect the issue preclusive effect of the judgment in subsequent litigation involving the same issue.

*Tobias* is subject to the same limitations as *Murphy*. The prior judgment claimed to have issue preclusive effect was a state rather than federal court judgment. The district court, moreover, did not consider whether there was a difference in the burden of persuasion in the two actions and the effect of that difference, if any.

**28.** Holdings Mem. 13–14.

DeGeus and Löffelhardt are the two principals of Holdings. They and their counsel litigated the prior action on behalf of themselves and Holdings, which they formed as a vehicle to take title to the ICD shares which, in economic substance, they purchased from Frankel and Leviant. It is undisputed that they control Holdings in all respects. In these circumstances, Holdings is in privity with them and is bound by the Court's prior determination with respect to their individual fraud defenses even though Holdings lacked standing to pursue a fraud defense in its own right.[29]

Holdings raises no other objections to the issue preclusive effect of the prior judgment. In consequence, the Court holds that the decision in the prior action precludes Holdings from asserting that the Estimated Cash Purchase Price or the Book Value of ICD was overstated by more than $6.78 million. As that was the only determination necessary to support the prior decision, the prior decision has no broader issue preclusive effect.

### B. Claim Preclusion

■ Frankel and Leviant briefly assert that Holdings' fraud claims are barred by the doctrine of claim preclusion.[30]

■ Under established principles, a final judgment on the merits "prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding."[31] Here, however, Holdings does not rely on any claim or defense that was available to it in the prior proceeding except to the extent

that it asserts that the amount of the alleged overstatement exceeded $6.78 million.

The prior action, as noted above, was a suit on the promissory notes and the guarantees, not on the purchase agreement. Fraud in the inducement was a defense only to the extent that Holdings, deGeus and Löffelhardt were entitled and able to show that they would not have executed those instruments but for the alleged fraud. Holdings, the Court held, waived the defense entirely. DeGeus and Löffelhardt did not, but they were unable to raise a genuine issue as to whether there was an overstatement of the Estimated Cash Purchase Price sufficiently large to have relieved them of their obligation under the purchase agreement, which they signed before any fraud allegedly occurred, to execute and deliver the guarantees. Claims of fraudulent overstatement of the Estimated Cash Purchase Price in any lesser amount would not have been legally sufficient defenses to the action. Hence, the judgment determining that there was no overstatement of sufficient magnitude to avoid the guarantees does not bar a claim of overstatement in a smaller amount.[32] Accordingly, none of Holdings' claims is barred under the doctrine of claim preclusion.

### II. Performance by Holdings of its Contractual Obligations to Frankel and Leviant

■ Frankel and Leviant next seek dismissal of Holdings' contract claims. They assert that a plaintiff's own performance of a contract is a prerequisite to its recovery for breach by the defendant. Holdings, they assert, has not and cannot allege due perfor-

---

**29.** See, e.g., Montana v. United States, 440 U.S. 147, 154, 99 S.Ct. 970, 974, 59 L.Ed.2d 210 (1979); Marine Midland Bank v. Slyman, 995 F.2d 362, 365 (2d Cir.1993); Alpert's Newspaper Delivery, Inc. v. The New York Times Co., 876 F.2d 266, 270–71 (2d Cir.1989).

**30.** Frankel and Leviant Mem. 13.

**31.** Brown v. Felsen, 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979); see generally RESTATEMENT (SECOND) OF JUDGMENTS §§ 17–19 (1982).

**32.** See, e.g., Sekaquaptewa v. MacDonald, 575 F.2d 239, 246–47 (9th Cir.1978) (prior decision regarding entirety of disputed land area not pre-

clusive of litigation over rights to portion of land).

Frankel and Leviant do not assert that the present claims are precluded by the prior judgment by virtue of the failure to assert them as counterclaims in the prior action. In any case, such a contention would lack merit for reasons already alluded to. The unusual procedural posture of the case that resulted from its commencement in the state court by motion for summary judgment in lieu of complaint meant that Holdings, deGeus and Löffelhardt never were obliged to file an answer and that their counterclaim. therefore was not compulsory.

mance because it has failed to pay the notes given as part of the purchase price for the ICD stock.

■ Due performance by the plaintiff is an element of a claim for breach of contract under New York law.[33] Nevertheless, it is far from clear that a plaintiff is required to plead his or her own due performance in order to state a claim upon which relief may be granted.

Some district court decisions have held that a breach of contract plaintiff must make some allegation of its own performance.[34] On the other hand, the common law requirement that a contract plaintiff affirmatively allege the performance or occurrence of all conditions precedent has been abolished in New York practice [35] and, it would appear, under Federal Rule 9(c) [36] as well. The Rule does not in terms require the plaintiff to allege the performance or occurrence of conditions precedent; it simply permits a plaintiff to do so generally and requires specificity in the denial of any such allegation. The philosophy of notice pleading that underlies the Federal Rules of Civil Procedure—which in most cases require only "a short and plain statement of the claim showing that the pleader is entitled to relief" [37]—suggests that such a formalistic rule no longer has a place in federal practice. But there is no need to determine that issue in this case.

The essence of the position taken by Frankel and Leviant here is that Holdings cannot allege its own due performance because it has not paid the $5 million in notes which it gave for a comparatively small part

of the purchase price. This action, however, is for breach of the purchase agreement. While Frankel and Leviant suggest that payment of the notes was among Holdings' obligations under the purchase agreement, their argument is unpersuasive.[38] Moreover, the complaint certainly does allege that Holdings delivered the notes and paid the Estimated Cash Purchase Price demanded. Thus, the complaint alleges that Holdings performed its major obligations.

Given that the complaint, generously construed as it must be, makes out a claim for relief and that Frankel and Leviant have advanced no substantial reason for believing that there has been any material failure of performance of Holdings' obligations under the purchase agreement, the Court declines to elevate form over substance. Insofar as Frankel and Leviant seek dismissal on the ground that there is no broader allegation of due performance by Holdings, the motion is denied.

III. *The Alleged Breach of the Implied Covenant of Good Faith and Fair Dealing*

■ The second claim for relief alleges that Frankel and Leviant breached the covenant of good faith and fair dealing implied in every contract and therefore in the purchase agreement. The claim rests entirely on the breaches of the purchase agreement alleged in the first claim for relief.

■ A claim for breach of the implied covenant "will be dismissed as redundant where the conduct allegedly violating the im-

---

**33.** *E.g., Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir.1996); *R.H. Damon & Co. v. Softkey Software Products, Inc.*, 811 F.Supp. 986, 991 (S.D.N.Y.1993); *Van Brunt v. Rauschenberg*, 799 F.Supp. 1467, 1470 (S.D.N.Y.1992).

**34.** *E.g., Tagare v. NYNEX Network Systems Co.*, 921 F.Supp. 1146, 1150 (S.D.N.Y.1996); *Reuben H. Donnelley Corp. v. Mark I Marketing Corp.*, 893 F.Supp. 285, 290 (S.D.N.Y.1995); *R.H. Damon & Co.*, 811 F.Supp. at 991.

**35.** *Allis-Chalmers Mfg. Co. v. Malan Const. Corp.*, 30 N.Y.2d 225, 231–33, 331 N.Y.S.2d 636, 639–40, 282 N.E.2d 600, 601–03 (1972).

**36.** FED.R.CIV.P. 9(c) provides: "In pleading the performance or occurrence of conditions precedent, it is sufficient to aver generally that all

conditions precedent have been performed or have occurred. A denial of performance or occurrence shall be made specifically and with particularity."

**37.** FED.R.CIV.P. 8(a)(2).

**38.** They rely on Sections 1.03(c) and 10.15 of the purchase agreement, the former of which they raise for the first time (and misquote) at page 7 of their reply memorandum. Section 1.03(c) simply requires that the purchase price be in the form of $5 million in notes and the balance in cash, the latter amount being subject to later adjustment. Section 10.15 did no more than make the payment obligations absolute.

plied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." [39] That is precisely the case here. The second claim for relief is dismissed.

## IV. *The Fraud and Related Claims Against Eisner*

■ The fourth and seventh claims for relief charge Eisner with common law fraud and with aiding and abetting the alleged fraud by Frankel and Leviant, respectively. The fifth accuses it of negligent misrepresentation. The tenth seeks relief on a theory of breach of fiduciary duty. All four claims are based on the common theme that Eisner acted in concert with or aided and abetted Frankel and Leviant in making six alleged misrepresentations.

Eisner seeks dismissal of all of them on the ground that they fail to allege fraud with the particularity required by Rule 9(b) in three respects. According to Eisner, they do not allege facts giving rise to a strong inference of *scienter*, rest on allegations made only on information and belief, and do not plead the alleged overstatements of the Estimated Cash Purchase Price and the Book Value with particularity.[40] In evaluating this branch of Eisner's motion, it is useful to describe in somewhat more detail the theory that Holdings has set forth in its amended complaint.

The pleading alleges that Frankel and Leviant knew or were chargeable with knowledge that the Book Value of ICD was sufficiently low that its accurate disclosure would have given Holdings the right to walk away from the deal.[41] As they allegedly would have been unable to find another purchaser if deGeus and Löffelhardt had declined to close, would have lost deGeus and Löffelhardt as key employees, and would have been unable to secure the financial benefits of the proposed transaction, they secured the appointment of Eisner as the accounting firm because they knew that it could be manipulated to act in concert with them to overstate the reported Book Value and hence the Estimated Cash Purchase Price.[42] The defendants, acting in concert, then made the misrepresentations relied upon in order to induce Holdings, deGeus and Löffelhardt to go forward with the transaction.[43]

Many of these allegations are made "on information and belief." Moreover, the complaint contains no suggestion as to why Eisner would have engaged in such duplicitous behavior apart from the fact that it previously had been responsible for auditing ICD's financial statements and is said to have had a "long-standing relationship with Frankel and Leviant."[44] Indeed, the complaint is ambivalent as to whether Eisner acted culpably—it alleges, upon information and belief, that "Eisner's Failure to Account resulted from Frankel's and Leviant's direction to Eisner or from Frankel's and Leviant's willful withholding of information which could enable Eisner to accurately evaluate the Book Value

---

**39.** *Houbigant, Inc. v. ACB Mercantile, Inc.*, 914 F.Supp. 964, 989 (S.D.N.Y.1995), modified, 914 F.Supp. 997 (S.D.N.Y.1996); *accord, Canstar v. J.A. Jones Constr. Co.*, 212 A.D.2d 452, 453, 622 N.Y.S.2d 730, 731 (1st Dept.1995).

**40.** Eisner contends also that the respects in which the preliminary balance sheet misrepresented the Book Value and Estimated Cash Purchase Price are not adequately particularized. (Eisner Mem. 24–25) As its reply memorandum confirms, however, the real thrust of its position is that there was nothing wrong with the preliminary balance sheet at all: insofar as Holdings has pointed to specific alleged deficiencies in accounting, the balance sheet accurately conformed to the requirements of the purchase agreement. (Eisner Reply Mem. 15–17) The fact that Eisner is able to identify and rebut the claimed deficiencies in the preliminary balance

sheet demonstrates that Holdings has adequately informed the defendants of the respects in which the statement is said to have been false or misleading.

**41.** Am.Cpt. ¶ 75.

**42.** *Id.* ¶¶ 76–79

**43.** *Id.* ¶¶ 80–82 The complaint alleges also, again on information and belief, that Eisner—at the direction of Frankel and Leviant—did not journey to the former Soviet Union to review financial records of the Russian subsidiaries, although such a trip was necessary, and failed to follow up on information concerning certain accounting discrepancies with respect to those subsidiaries. *Id.* ¶¶ 43, 49.

**44.** *Id.* ¶ 107; *see id.* ¶ 22.

and Purchase Price."[45] Nevertheless, the complaint alleges also, without the information and belief qualification, that the Estimated Cash Purchase Price was overstated by approximately $7.5 million and that the misrepresentations in question were "known by [Eisner] to be false when made and were made with the intent or with recklessness to deceive and defraud in order to prevent ICD Holdings from walking away."[46]

Rule 9(b) of the Federal Rules of Civil Procedure requires that averments of fraud be made with particularity in order to protect a defendant's reputation from "improvident charges of wrongdoing," discourage strike suits, and provide fair notice of the basis for such claims.[47] The Rule therefore requires not only that the circumstances of the alleged fraud be pleaded with particularity, but that the plaintiff "allege facts that give rise to a strong inference of fraudulent intent."[48] Moreover, allegations of fraud made on information and belief are insufficient unless the facts are peculiarly within the knowledge of the defendant, and even in such cases facts setting forth a sufficient basis for the inference of fraud must be alleged.[49] This complaint does not even remotely satisfy the requirements of the Rule as to Eisner.

There are two theories on which a plaintiff may seek to establish the necessary inference of fraud: "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[50] While Eisner indisputably had the opportunity to commit fraud, there is not even the remotest suggestion of any motive sufficient to warrant the inference that it availed itself of that opportunity.[51] Hence, the sufficiency of Holdings' fraud allegations depends upon whether it has set forth strong circumstantial evidence of culpable wrongdoing.

Here there is precious little basis in the amended complaint for inferring conscious misbehavior or recklessness. Although the complaint contains the conclusory assertion that Eisner knew or recklessly disregarded the fact that its own statement was inaccurate, there is no suggestion that Eisner knew what the Book Value and Estimated Cash Purchase Price actually were. Nor is there any substantial allegation that it knowingly or recklessly failed to carry out its task properly or disregarded discrepancies. The allegations that it failed to conduct or have conducted an on-site review of the books of

**45.** *Id.* ¶ 50.

**46.** *Id.* ¶¶ 46, 84.

**47.** *E.g., Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 663 (2d Cir.1997) (quoting *O'Brien v. Nat. Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir.1991)).

**48.** *Id.* (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994)).

**49.** *Id.* at 664; *Luce v. Edelstein*, 802 F.2d 49, 54 n. 1 (2d Cir.1986): *Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374, 379 (2d Cir.1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975): *Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir.1972); *Nat. Council of Young Israel v. Wolf*, 963 F.Supp. 276, 281 (S.D.N.Y.1997); *Am. Buying Ins. Services, Inc. v. S. Kornreich & Sons, Inc.*, 944 F.Supp. 240, 248–49 (S.D.N.Y.1996); *Spira v. Nick*, 876 F.Supp. 553, 557 (S.D.N.Y. 1995).

**50.** *Chill v. General Elec. Co.*, 101 F.3d 263, 267 (2d Cir.1996) (quoting *Shields*, 25 F.3d at 1128); *accord, e.g., San Leandro Emer. Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir.1996).

**51.** Many federal courts have held that the fact that professional service firms like Eisner receive fees for their services is insufficient to supply the motive essential to the motive-and-opportunity theory under Rule 9(b). *E.g., Melder v. Morris*, 27 F.3d 1097, 1103 (5th Cir.1994); *Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp.*, 941 F.Supp. 1369, 1382 (S.D.N.Y.1996); *Duncan v. Pencer*, No. 94 Civ. 0321(LAP), 1996 WL 19043 (S.D.N.Y. Jan.18, 1996); *SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1242 (S.D.N.Y.1992); *Friedman v. World Nurseries Ltd. Partnership*, 730 F.Supp. 521, 532 (S.D.N.Y.1990), *aff'd mem.*, 927 F.2d 594 (2d Cir.1991); *see also Chill*, 101 F.3d at 268 (alleged desire to justify investment in subsidiary held insufficient to establish motive to misrepresent subsidiary's financial condition); *San Leandro Emer. Med. Group Profit Sharing Plan*, 75 F.3d at 813–14 (alleged desire to maintain company's credit rating insufficient basis for inferring fraud); *Acito v. IMCERA Group*, 47 F.3d 47, 54 (2d Cir.1995) (alleged desire to inflate stock price to increase defendants' compensation held insufficient).

the Russian subsidiaries and that it disregarded "certain accounting discrepancies with respect to" those entities,[52] are made on information and belief, and neither is supported by any statement of facts as required by Rule 9(b).

Accordingly, the Court holds that the fraud allegations against Eisner fail to state a claim upon which relief may be granted. The fourth, fifth, seventh and tenth claims for relief therefore will be dismissed as against Eisner.[53] As deliberate fraud is not a necessary element of either the fifth or tenth claim for relief, which assert negligent misrepresentation and breach of fiduciary duty, respectively, leave to replead those causes is appropriate unless they are dismissable on other grounds.[54]

### V. The Breach of Contract and Malpractice Claims Against Eisner

██ The eighth and ninth claims for relief allege breach of contract and professional malpractice by Eisner. The theory of both is that Holdings, together with Frankel and Leviant, jointly retained Eisner and that the alleged overstatement of the Book Value and Estimated Cash Purchase Price was the product of malpractice and breach of Eisner's contractual duties, said to have been set forth in the purchase agreement, to Holdings.[55] Eisner seeks dismissal on the grounds that (1) Eisner was never its client and therefore lacks standing to bring these claims, (2) the scope of Eisner's engagement in any case was set forth in letters dated March 28 and May 31, 1995 rather than in the purchase agreement, which it never signed, (3) Eisner did exactly what the scope of its engagement required, and (4) Eisner in any case performed its services in accordance with the purchase agreement.[56]

### A. Standing and the Scope of the Engagement

The complaint alleges that "ICD Holdings, together with Frankel and Leviant pursuant to a retention agreement, jointly retained Eisner to perform certain accounting functions ..."[57] That allegation must be taken as true for purposes of this motion to dismiss. Eisner's contention that Holdings "fails to allege the date of this alleged agreement or whether it was written or oral"[58] is beside the point, as there is no requirement that such details be pleaded in a contract or professional malpractice case.

Very much the same point disposes of Eisner's contention that the scope of its engagement was set forth in its March 28 and May 31, 1995 letters rather than in the purchase agreement. The amended complaint asserts that Eisner was retained by Holdings and the other defendants to prepare "an accurate statement [of] Book Value in accordance with U.S. GAAP and ... an accurate statement of the Estimated Cash Purchase and Final Cash Purchase Prices,"[59] which at

---

**52.** Am.Cpt. ¶¶ 43, 49.

**53.** The fifth and tenth claims for relief are for negligent misrepresentation and breach of fiduciary duty, respectively, which do not require pleading and proof of *scienter*. Holdings, however, has specifically incorporated its allegations of deliberate fraud in both claims. *See, e.g.*, Am. Cpt. ¶¶ 89, 121 (incorporating by reference allegation in paragraph 84 that Eisner knew or recklessly disregarded the falsity of its representations). Rule 9(b) applies in such circumstances. *See Burnett v. Physicians' Online, Inc.*, No 94 Civ. 2731 TPG, 1997 WL 470136, at * 10 (S.D.N.Y. Aug.15, 1997) (applying Rule 9(b) to breach of fiduciary claim predicated on fraud); *In re Leslie Fay Companies, Inc. Securities Litigation*, 918 F.Supp. 749, 766 (S.D.N.Y.1996) (applying Rule 9(b) to negligent misrepresentation claim based on fraud).

**54.** In view of the fact that Holdings has been polishing its fraud allegations since the prior action, amended once already in this action, and has not sought leave to amend in response to this motion, the Court is not inclined to permit future amendment. It does so as to the negligent misrepresentation and breach of fiduciary duty claims only because it appears that legally sufficient claims which should be decided on the merits might be stated. The same cannot be said of claims requiring proof that Eisner engaged in culpable wrongdoing.

**55.** Am.Cpt. ¶¶ 110–20.

**56.** Eisner Mem. 25–32 & n. 11.

**57.** *Id.* § 110.

**58.** Eisner Mem. 32 n. 11.

**59.** Am.Cpt. ¶ 110.

least arguably referred to the preparation of statements in accordance with the purchase agreement. As the Court is obliged on this motion to accept the truth of these allegations as well, it must assume for purposes of this motion that the scope of Eisner's engagement was defined by the purchase agreement.[60]

### B. Compliance with the Purchase Agreement

#### 1. AOZT and Hisparus

As explained in *Frankel I and Frankel II,* the core of this dispute is whether AOZT Versus and Hisparus, two Russian subsidiaries of ICD, had negative equity values as of September 30, 1993, the amounts of any such negative equity values, and whether any such negative values were required to be included in the Book Value reflected in the preliminary balance sheet.[61] Eisner now claims that the equity value of these Russian subsidiaries was not intended by the purchase agreement to be included in the preliminary or closing balance sheets.[62] If it is correct, this central element of Holdings' claim will fail.

Eisner contends that Exhibit 6.03(4) to the purchase agreement makes clear that the parties intended that AOZT Versus and Hisparus were not to be included in the preliminary or closing balance sheets, but were among the items that would be accounted for, if necessary, by a post-closing additional contingent purchase price payment. There is substantial force to the argument, both from the terms of Exhibit 6.03(4) and from the fact that evidently neither side in the transaction had up-to-date financial statements for either subsidiary. Nevertheless, Holdings' position is not clearly wrong, at least on the face of the documents. AOZT Versus and Hisparus were "Retained Businesses" as that term was

defined in the purchase agreement.[63] The Book Value was defined to include the excess of assets over liabilities "of the Retained Businesses ..."[64] Hence, there is support for the position that the equity value of these entities was to have been included.

As the foregoing demonstrates, there manifestly is a material issue of fact as to whether the purchase agreement required the equity values of these entities to be included.

#### 2. ICD Paris

Holdings contends that Section 6.11 of the purchase agreement required that any negative book value of ICD Group S.A., referred to as ICD Paris, which was sold separately to Holdings, be credited against the purchase price for ICD, that in fact ICD Paris had a negative book value, and that Eisner failed properly to reflect that negative value in the preliminary and closing balance sheets.[65] Eisner rejoins that there was no such obligation.

Section 6.11 of the purchase agreement provides:

> "If prior to June 30, 1994, Sellers sell, transfer or otherwise dispose of at least 50% of the outstanding stock or assets of ICD Group (Hong Kong) Limited ..., Sellers shall have the right, at Sellers' option, to require Buyer to acquire on the closing date of the ICD Hong Kong Sale, all of the outstanding stock or assets of ICD [Paris] for a purchase price equal to the book value (the 'ICD S.A. Book Value') of the assets of ICD [Paris]. If the ICD S.A. Book Value shall be negative at the time of the acquisition by Buyer, Sellers shall pay to Buyer the amount by which the ICD S.A. Book Value is less than zero."

---

**60.** Eisner contends that the purchase agreement and the March 28 and May 31, 1995 letters are properly before the Court on this motion and invites the Court to determine the scope of Eisner's engagement with reference to these documents as well. Given the allegations in paragraph 110 of the complaint, however, such a determination would require the Court to decide an issue of disputed fact. It declines to do so.

**61.** *Frankel II,* 939 F.Supp. at 1127–29; *Frankel I,* 930 F.Supp. at 59–60.

**62.** Eisner Mem. 28.

**63.** Purchase agreement § 1.06 & Ex. 1.06 thereto.

**64.** *Id.* § 1.04(a).

**65.** Am.Cpt. ¶¶ 40, 45, 57.

As the foregoing makes clear, Holdings was entitled to be paid an amount equal to the negative book value of ICD Paris if and when Frankel and Leviant sold it to Holdings. This strongly suggests that the equity value of ICD Paris was to have been excluded in the determination of the purchase price for ICD because, among other reasons, Holdings otherwise would have been credited with the negative equity both in the ICD purchase price and by a separate payment or credit.

Holdings responds that ICD Paris was sold at the same time as ICD and that the purchase agreement required that the purchase price for ICD be adjusted downward to reflect the negative equity.[66] Eisner counters that the negative equity in fact was credited against the purchase price of ICD Paris.[67]

Assuming the accuracy of Eisner's contention that Holdings got the benefit of the contemplated credit for the negative equity value of ICD Paris, albeit in the ICD Paris rather than the ICD acquisition, it would appear that Holdings got all that it was entitled to. Nevertheless, this is a motion to dismiss. The assertion that the credit was given on the ICD Paris transaction first was made in Eisner's reply memorandum and in any case is outside the pleadings. As the Court is obliged to accept as true the allegations of the complaint, and as there is no admissible evidence outside the pleadings that could be taken into account on this point under Rule 12(b), this aspect of Eisner's motion also must be denied.

### 3. The Consolidation Eliminations

It is common ground among the parties that the statements prepared by Eisner incorrectly overstated Book Value by $1.5 million by failing to make required consolidation eliminations and that Frankel and Leviant refunded that amount promptly. Holdings concedes that it therefore has no direct damages as a result of this error. It neverthe-less contends that it suffered consequential damages as a result of the error.

The prompt repayment of the $1.5 million overpayment eliminates any direct damages to Holdings. Its claim of consequential damages does not appear in the amended complaint. In consequence, this aspect of the amended complaint will be dismissed, albeit with leave to amend to assert this damage theory.

### VI. The Breach of Fiduciary Duty Claim Against Eisner

■ Eisner moves to dismiss the tenth claim for relief, which asserts breach of fiduciary duty, on the ground that it owed no fiduciary duty to Holdings. It contends that Holdings was not its client, and, in any case, that accountants do not owe even their clients fiduciary obligations.

■ In view of the Court's holding that the complaint adequately alleges that Holdings was a client of Eisner, Eisner's motion cannot succeed on this ground. "While it is true that the '[c]ourts do not generally regard the accountant-client relationship as a fiduciary one', where the allegations include knowledge and concealment of illegal acts and diversions of funds and failure to withdraw in the face of a conflict of interest ... such a cause of action against an accountant will be permitted to stand."[68] Nevertheless, the Court has dismissed so much of the complaint as asserts fraud against Eisner. Absent a legally sufficient allegation of fraud, there is no basis for concluding that there was any breach of fiduciary duty. Accordingly, the tenth claim for relief is dismissed.

### Conclusion

For the foregoing reasons, defendants' motions to dismiss the amended complaint are granted to the extent that:

1. Holdings is precluded from asserting that the Book Value or Estimated

---

66. Holdings Mem. 21.

67. Eisner Reply Mem. 16.

68. *Nate B. & Frances Spingold Foundation v. Wallin, Simon, Black & Co.*, 184 A.D.2d 464, 465–66, 585 N.Y.S.2d 416, 417 (1st Dep't 1992) (quoting *Fund of Funds, Ltd v. Arthur Andersen & Co.*, 545 F.Supp. 1314, 1356 (S.D.N.Y.1982)); *see Lavin v. Kaufman, Greenhut, Lebowitz & Forman*, 226 A.D.2d 107, 109, 640 N.Y.S.2d 57, 58 (1st Dep't 1996).

Cash Purchase Price was overstated on the preliminary or closing balance sheet by more than $6.78 million.

2. The second, seventh and tenth claims for relief are dismissed.

3. The fourth claim for relief, insofar as it is asserted against Eisner, is dismissed.

4. The fifth claim for relief, and so much of the eighth and ninth claims for relief as relate to the alleged failure to make consolidation eliminations, all are dismissed with leave to replead within ten days of the date hereof for the limited purposes stated above.

The motions to dismiss are denied in all other respects.

SO ORDERED.